## DISSOLUTION OF A LABOR UNION.

Common Pleas Court of Cuyahoga County.

JOHN A. KEALEY ET AL V. A. L. FAULKNER ET AL.

Decided, December 26, 1907.

*Procedure—Where a Nondescript Association is Involved—Application of Section 5008—Parties in Pari Delicto—Jurisdiction—Public Policy—Right of Labor and Capital to Combine—Right of the Public to Industrial Freedom—When Combination becomes Unlawful—Methods which are Inimical to the Public Welfare—Disaffirmance of an Executory Contract—Decree Dissolving the Amalgamated Window Glass Workers of America and Appointing a Receiver for its Funds which after Payment of Just Claims must be Distributed Among the Members by Whom it was Contributed.*

1. One object of Section 5008, Revised Statutes, is to enable nondescript associations of persons to obtain a standing in court, without inordinate delay and expense; and it is sufficient, both for jurisdiction and for judgment, if the interest that is held in common be fairly represented by those who are in court. In an action between factions of an association whose purposes and methods are against public policy, although the parties plaintiff are *in pari delicto*, and therefore not entitled to relief, the action may nevertheless be maintained *in the interest of the public*, where it is in disaffirmance of an executory contract.

2. Men may combine and co-operate for the advantageous marketing of their skill and labor, or their capital; but this right is limited by the right of the public to have industrial and commercial freedom maintained and promoted. Whatever, of purpose or of method transcends these bounds, if in its tendency it is opposed to the public welfare, is under the ban of the law and its administration.

3. The leading general purpose of the Amalgamated Window Glass Workers of America is, to protect and promote the interests of its members—a purpose that is both lawful and commendable; but many of its ancillary purposes and methods plainly contravene public policy, and render the association an illegal organization.

*Decree:* The association is dissolved, and a receiver appointed to take charge of its funds.

*Hoyt, Dustin & Kelley,* for plaintiffs.
*D. H. Tilden* and *E. J. Pinney,* contra.

PHILLIPS, J. (orally).

There is a demurrer to the petition and the amendment thereto, on the ground: first, that there is defect of parties defendant; second, that the petition and its amendment do not state a right of action. The action is a contest between factions of the Amalgamated Window Glass Workers of America, which is an unincorporated association of glass workers, designated as glass blowers, gatherers, flatteners and cutters, and comprising about six thousand men. The plaintiffs are representatives of the two trades, flatteners and cutters, who claim that they have not received fair treatment from the hands of the organization; that the organization is illegal; that they have contributed to its funds; and that the association now has a fund in excess of $100,000. They ask that the association be dissolved, that a receiver be appointed, and that this fund be distributed among the members of the organization according to their respective individual rights in it.

The plaintiffs allege that they are representatives of the said two classes, in whose interest this action is brought, and they make the officers of the organization, and perhaps some other individual members, defendants. They allege that these officers control the funds of the association and are in charge of the organization for the purpose of enforcing its by-laws and conducting its internal regulations. In other words, it appears from the allegations of the petition that these persons who are made defendants are representatives of all the interests of the association not represented by the plaintiffs. No other persons are made defendants, so far as the merits of the action are concerned. Some others are made defendants because they are in possession of some of the funds of the association.

It is claimed, in the first place, that there are not parties enough to this action. These plaintiffs sue for a large portion of the membership, although a minority of them, having interests similar to their own interests, and whose interests these plaintiffs represent, and the action is against those few persons named as defendants as representatives of a class of persons too numerous to be individually made parties.

The action in this regard is brought under favor of Section 5008 of the statutes, which reads:

"When the question is one of a common or general interest of many persons, or when the parties are very numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."

In the 50th Ohio State, at 708, our Supreme Court comments upon this provision of the statute, in this language:

"It was the general rule in chancery, before the adoption of the civil code, that suits must be prosecuted by the real parties in interest, and that all who were united in interest must be joined. There were, however, certain well established exceptions to the rule which, like the rule itself, were adopted for the convenient administration of justice. Among these exceptions, it is stated in Story's Equity Pleading, Section 97, were: '(1) Where the question is one of a common or general interest, and one or more sue, or defend, for the benefit of the whole; (2) Where the parties form a voluntary association for public or private purposes, and those, who sue or defend, may fairly be presumed to represent the rights and interests of the whole; (3) Where the parties are very numerous, and although they have, or may have separate, distinct interests; yet it is impracticable to bring them all before the court.'
"In speaking of the second class of exceptions above mentioned, it is said that, 'In cases of this sort the persons interested are commonly numerous, and any attempt to unite them all in the suit would be, even if practicable, exceedingly inconvenient, and would subject the proceedings to danger of perpetual abatements, and other impediments, arising from intermediate deaths, or other accidents, or changes of interest. Under such circumstances, as there is a privity of interest, the court will allow a bill to be brought by some of the parties in behalf of themselves and all the others, taking care that there shall be a due representation of all the substantial interests before the court.' So that the principle upon which that class of exceptions rested is not different in substance from that of the class last mentioned, namely, that the parties are numerous, and it is impracticable, in the convenient and speedy administration of justice, to have them all before the court; and the courts in many adjudged cases appear to have so regarded it. By reference to some of the

cases it will be seen how the exceptions were applied in practice, and when it was deemed by the courts impracticable to bring all of the parties, when numerous, before the court.''

And the court further say that Section 5008 is an adoption of this rule in equity, and has a like application.

In Pomeroy's Equity Remedies, as it is now called, he considers this matter at Section 293, which I read:

''I pass now to consider the nature of the action brought by one on behalf of others, and its effects upon the rights and duties of those who are represented by the actual plaintiffs. The persons not named in such cases are not parties to the suit unless they afterwards elect to come in and claim as such, and bear their proportion of the expenses. It is optional with them whether they will become parties or not, and until they so elect they are, in the language of the books 'in a sense deemed to be before the court.' They are so far before the court that if they neglect, after a reasonable notice to them for that purpose, to come in under the judgment and establish their claim, the court will protect the defendants and the parties named from further litigation in respect of the same fund or other subject-matter, especially so far as such litigation may tend to disturb the rights of the parties as fixed by the judgment. A person who elects to come in and make himself a party must apply for an order making him such, and upon the granting of the order he is to all intents and purposes a party.''

After the examination of a number of authorities that I do not now refer to, I come to this conclusion about it: The object of the provision in the statute, as it was the object in equity procedure, is to enable these outlying nondescript associations of persons —not incorporated, not a partnership really, although in some respects they are so—both to sue and to be sued. It is important, in the interest of these unincorporated organizations—not against them, but in their interest—to enable them to get a standing in court without too great inconvenience, too great delay, or too great expense. I think the spirit of this provision is, that in such cases it is sufficient for all purposes, both for jurisdiction and for judgment, if the interest that is held in common is represented in the case. If a common interest is represented, if the common interest is brought into court by the bringing in

of persons who represent that interest, it is sufficient. Enough persons must be brought in, both as plaintiffs and as defendants, to fairly represent those not brought in, in order that the court may see that the common interest is represented. It may then be prosecuted, so far as the plaintiffs are concerned, and it may then be defended, so far as the defendants are concerned. This is all that is requisite. Without such provision and without such interpretation and application of it, it would not be possible in a case like this, either for the association to sue, or for the association to be sued. I have not been unmindful of the fact that it is not an association that is suing, and that it is not an association that is sued really—it is a part of the membership that is sued. There is no complaint here as to the plaintiffs, no objection to the way in which the suit is brought, so far as the parties plaintiff are concerned. I think the persons who are made defendants do represent the interests of all the members of this association; they are representative elements in it; they have a right to represent the association; it is their duty to represent it; they control the funds of the association; and whatever concerns the general membership of the association, it is their duty to look after; and if the membership should be personally notified, it may be, although I do not determine this, it may be that the duty devolves upon these defendants here to give such notice. Making them parties here is *ipso facto* notice through them to all the membership. Any other construction, any other application, it seems to me, of this provision of the statute, would defeat its purpose. So that, so far as this branch of the demurrer is concerned, I think it not well taken.

In support of the petition in matter of substance, it is claimed that the Amalgamated Window Glass Workers of America, by its expressed purposes and its conceded methods, is a menace to the public welfare, and must therefore be dealt with as an organization that is opposed to the public policy of the country. The demurrer to the petition can not be disposed of without deciding this question, a question so important, not only in the instance, but upon principle as well, that I have given to its consideration all the care and contemplation that circumstances

would allow, and in this labor I have been greatly helped by the zealous industry of counsel on both sides.

I have endeavored, with what diligence I might, to discover the true *criteria* by which to determine whether an avowed purpose, or an adopted method, stands *for* or *against* the public policy. And I have tried to find out by what considerations we ought to determine the limits within which an association of men may rightfully control a productive industry, and to what extent the courts may interefere with attempted control.

To clear the way, I must advert to some things that are commonplace, even at the risk of being a little discursive.

In organized society every one retains, of right, his individuality; and he sustains, of necessity, the social relations. As an individual he produces and he appropriates—he creates and he consumes; and if he is able and disposed he accumulates. As a member of society he intercommunicates and exchanges. These relations are so interwoven, that to promote one's individual welfare is to enhance the well-being of society, by enlarging the capacity of the individual both to do and to enjoy; and *vice versa*, to promote the general welfare is to enhance the well-being of the individual, by improving his opportunities for interchange and intercommunication.

Upon considerations that I need not stop to point out, the law, in the administration of commutative justice, gives priority to the public welfare over the welfare of individuals. No one may rightfully do, or obligate himself to do, anything the tendency of which is against the public good. The interest of individuals must be subservient to the public welfare. *Salus populi suprema lex.*

Among the things that bring prosperity and contentment to a people, are (1) a productive industry, and (2) distributive justice. There must be industry, and there must be such employment of industry as to make it fairly productive; and there must be a fair division of the product of industry among those who help to produce it. There can be no real prosperity of a community unless there is industry; there can be no prosperity unless this industry is made

productive; and there can be no prosperity unless there be just division of the total product of industry among those whose industry has produced it. And just division does not mean share and share alike; but distribution to each according to the productive energy each has contributed to the fund total, whether the energy contributed has been physical or mental. Industry, to be productive, must be well directed. So that production involves both work and management. And if industry be well directed, and therefore productive, yet if the fund total be so unjustly divided that some are unjustly enriched, while others are unjustly impoverished, there is no real prosperity—that is, there can be no community prosperity. If conditions be such that those who, by work or by management, have contributed the least productive energy shall get most from the fund total, there is no community prosperity; on the contrary, there is extortion and oppression. A great fortune that is the fruit of dishonesty tells of unjust division of the product of industry; and it therefore · engenders discontent. A great fortune acquired dishonestly may well create unrest, not · because of the power it gives to its possessors—for that inheres in great fortunes honestly acquired—but because of the unrequited industry that lies in its wake. This is why the hand of the government may deal with "successful dishonesty"—or rather with the conditions which foster dishonest acquisition.

One of the chief reasons for the creation of government, and therefore one of the chief functions of government, is to prevent extortion and oppression and to foster a productive industry by maintaining a just division of the fruits of industry. This is distributive justice, as it is known to jurisprudence. To use an expression of the French jurists, it is seeing to it that neither equal persons have unequal things, nor unequal persons things equal.

Every one is perfectly free to bring his capital or his labor into the market on such terms as he may deem best. This is a fundamental postulate and, as an inseparable corollary therefrom no one may, of right, impair or impinge upon this individual freedom to use one's labor or capital.

This individual freedom as to the marketing of one's labor or capital belongs equally to an aggregation of labor or of capital; and the duty not to impair or impinge upon this freedom of labor and of capital rests equally upon any aggregation of men. In other words, the right is not enlarged, nor is the duty lessened, by the association. Stated differently again, this right and this duty do not arise from the coming together of men; they inhere in and attach to the individual, as a member of the community. And when labor or capital is united, for the advantageous marketing thereof, this individual right of freedom and this individual duty to desist attach to the aggregation, whether it be of capital or of labor.

I read an extract from an opinion in the 214th Pa. State, page 357:

"The right of a workman to freely use his hands and to use them for just whom he pleases, and upon just such terms as he pleases, is his property, and so in no less degree is a man's business in which he has invested his capital. The right of—employer and employe—is an absolute one, inherent and indefeasible, of which neither can be deprived, not even by the Legislature itself. The protection of it, though as old as the common law, has been reguaranteed in our Bill of Rights. 'All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, or acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.' The principle upon which the cases, English and American, proceed is, that every man has the right to employ his talents, industry and capital as he pleases, free from the dictation of others; and if two or more combine to coerce his choice in this, it is criminal conspiracy. The labor and skill of the workman, be it high or low degree, the plant of the manufacturer, the equipment of the farmer, the investments of commerce are all, in equal sense, property. A person's business is property, entitled under the Constitution to protection from unlawful interference. Every person has a right, as between his fellow-citizens and himself, to carry on his business, within legal limits, according to his own discretion and choice, with any means that are safe and healthful, and employ therein such persons as he may select."

This right of commercial freedom, and this correlated duty to forbear, and the origin, the scope, and the purpose thereof, must be kept well in mind, for the due consideration and the safe determination of the questions that here confront us. If I may venture a modest criticizm, it was failure to properly advert to these considerations that led some of the courts, in the earliest cases, to make announcements that have come to be regarded as of doubtful authority.

The Amalgamated Window Glass Workers of America is composed of skilled workmen—artisans, men trained to dexterity in the making of window-glass. Because these men are skilled in the manufacture of an important article of commerce, they are able to contribute, in a special way, and in special measure, to the productive industry of the community; therefore the community has a special interest in the industrial freedom of these men, and each of them. One of these men could not obligate himself not to work at his trade. He might, of choice, decline to pursue his trade; but he could not obligate himself not to work at his trade; and if he should enter into a contract never again to work at his trade, the courts would not enforce the contract. Such contract would be against public policy. It would impair the industrial freedom in which the public is interested, and which it is the duty of government to protect and promote. It is this *indicium,* the impairment of industrial freedom, that discriminates and vitiates such contracts.

Our Supreme Court has said of such engagement that it tends to oppression by depriving the individual of the right to pursue a trade with which he is most familiar and by depriving the community of the services of a skilled laborer; and it tends indirectly to affect the price of such things as would be produced by his labor.

And for the same reasons that one man may not, by contractual obligation, impair or limit his industrial freedom, any number of men may not. And the individual may not, by union with others, surrender his right of industrial freedom to the association. The tendency of such impairment of the right of industrial freedom is against the general welfare, and is therefore

against the public policy which is promotive of the public good.

Chief Justice Wilmot said (I read a quotation found in the 18th Ohio State Reports, page 203) :

"Whatsoever a man may lawfully forbear, that he may oblige himself against, except where a third person is wronged, or the public is prejudiced by it." ,

In the light of the authorities to be referred to, let us see what is the legal character and status of the Amalgamated Window Glass Workers of America.

It is clear that the thing that vitiates a contract, under a principle of the law which we call "public policy," is not an intent to injure the public, but a *tendency* to the prejudice of the public. Actual injury is never required to be shown; it is the tendency to the prejudice of the public good which vitiates contractual relations.

Within the limitations I have stated, men may combine and co-operate, for the advantageous marketing of their skill and labor, or their capital. But this right is limited to an advantageous marketing of labor or capital, and it is limited by the right of the public to have industrial and commercial freedom maintained and promoted. Whatever, of purpose or of method, transcends these bounds, if in its tendency it is opposed to the public welfare, is under the ban of the law and its administration.

The undoubted trend of modern business is for the combination, both of capital and of labor. Combinations of capital have become a necessity. The great business undertakings of these times could not be carried on without it. And most of the labor is now employed in large aggregations of men. There is as much right, and I think as much reason, for laborers to combine for their protection and benefit, as for capital to combine. This inevitable tendency to combine can neither be ignored or repressed, nor should it be.

There is no law to compel a man or a body of men to work, and there is no law to prevent a man or a body of men from refusing to work. If there were such law, it would violate fundamental property-rights. Any man, and any body of men, may

work for, or refuse to work for whom they will. And the same
freedom belongs to the employer of labor. These are funda-
mental principles, recognized in all the decisions that are au-
thoritative.

It is noticeable that nowhere do the by-laws of this organiza-
tion state, in terms, its aims and purposes. These are to be
gathered from the several provisions and the general trend of the
by-laws, and from the averments of the petition, which, for the
purposes of this demurrer, are admitted, so far as they are well
pleaded.

I think the leading general purpose of the association is,
to protect and promote the interests of such window glass
workers as may be members of the association—a purpose that
is not only lawful. but commendable, if the auxiliary purposes,
and the methods to be employed, are likewise lawful.

*First.* It is one of the auxiliary purposes of this organiza-
tions to prevent any one not a member thereof, or an apprentice
authorized thereby, from working at the trade of window glass
blower, gatherer, flattener or cutter. And I read from the by-laws
that are made a part of the petition, Section 2, page 18, of the
copy that has been furnished me:

"No one not a member of the Amalgamated Window Glass
Workers of America shall be allowed to work at any of the
four trades, excepting our own apprentices."

Of course this policy, if enforced, would promote the indi-
vidual advantage of the members of the association. But how as
to the other side of the equation? If this policy is enforced,
the right of industrial freedom is thereby limited and impaired,
and the public is deprived of the right it has in the full and free
enjoyment of industrial freedom by every member of the com-
munity.

*Second.* This organization undertakes to limit the number of
glass workers in this country. And I read from pages 8, 9 and
10, Sections 3, 4, 5, 13 and 20.

"Section 3. That aside from sons and brothers, not to ex-
ceed an additional 10 per cent. of apprentices, per actual pot

capacity in operation, shall be granted to learn the trade of gathering, for blast of 1906-07.

"Section 4. That not to exceed 10 per cent. of the membership of flatteners shall be granted to learn to flatten, for blast of 1906-07.

"Section 5. That not to exceed 10 per cent. of the membership of the cutters shall be granted to learn to cut, for blast of 1906-07.

"Section 13. Any member attempting to learn either of the four trades, or making application, without the proper permission and papers, shall be fined $25.00.

"Section 20. No apprentice certificate shall be granted to any one who is not a white male, and has not attained the age of fifteen years, and must be of good moral character and able to read and write."

Part of that section I think, is right, and part of it I think is wrong.

I read an extract from the opinion in the case reported in the 63 L. R. A., a Minnesota case, an opinion by Judge Brown:

"The Constitution of our state guarantees liberty to every citizen, and a certain remedy in the laws for all injuries or wrongs which he may receive in his person, property or character; and the rights so guaranteed are fundamental, and can be taken away only by the laws of the land, or interfered with, or the enjoyment thereof modified, only by legal regulations adopted as necessary for the general public welfare. For the preservation, exercise and enjoyment of these rights, the individual citizen, as a necessity, must be left free to adopt such calling, profession or trade as may seem to him most conducive to his welfare.

"This right to choose one's calling is an essential part of that liberty which it is the object of the government to protect; and a calling, when chosen, is a man's property and right. Liberty and property are not protected where these rights are arbitrarily assailed. 'A person's occupation or calling, by means of which he earns a livelihood, and endeavors to better his condition, and to provide for and support himself and those dependent upon him, is property within the meaning of the law, and entitled to protection as such; and as conducted by the merchant, by the capitalist, by the contractor or laborer, is, aside from the goods, chattels, money, or effects employed and used in connection therewith, property in every sense of the

word.   Labor may organize, as capital does, for its own protection and to further the interests of the laboring class.   They may strike, and persuade and induce others to join them, but when they resort to unlawful means to cause injury to others with whom they have no relation, contractual or otherwise, the limit permitted by the law is passed, and they may be restrained.' ''

Now the provisions that I have read reach beyond the membership of this organization.   They undertake to prohibit others outside of its own membership from learning the trade of glass worker.   That is interfering with fundamental rights.   It is against the public policy, because it is for the public good that all men should be free to select, adopt and learn whatever trade they may desire, and then to pursue it.   Now, interference with that is unlawful because it is against the public interest.

Then this organization places restrictions upon the labor of its own members.   And I read several sections on that point. Page 10, Section 25:

"No member of Amalgamated Window Glass Workers of America shall be allowed to work at any non-union works.   For the violation of this law, they shall be subject to a fine at the discretion of the executive board."

‣ Page 19, Section 7:

"Any member signing an agreement of any kind to secure employment, shall be fined $25 for the first offense, $50 for second offense, and be suspended from membership for third offense."

Page 21, Section 20:

"No member of this association shall work for monthly wages, unless it be for guarantee to secure himself against loss or to retain himself in an undesirable position."

I read a short extract from a case in the Second Law Reports, page 622:

"Every workman is entitled to dispose of his labor on his own terms; but that right is conditioned, by the right of every other workman to do the like.   In particular, each employe is, as I

think, at liberty to decide for himself whether he will or will not work along with another individual in the same employ.''

Page 25, Section 18:

''No blower or gatherer shall work faster than at the rate of nine rollers per hour, excepting in case of roller falling off or pipes breaking. No blower or gatherer shall be allowed to start on the ninth roller until 50 minutes are up; this to also apply to the D. S. blower and gatherer according to their limit per hour, and that a fine of ten dollars be imposed on any and all preceptors for the non-enforcement of this law.''

Page 27, Section 31:

''No cutter shall be allowed to cut for more than $3\frac{1}{2}$ pots of S. S. and 3 pots of D. S.''

Page 32, Section 68:

''Any blower or gatherer working more than forty hours per week, shall, for the first offense, be fined fifty dollars, and for the second offense be expelled from the organization.''

I read from a case in the 216th Illinois, page 372:

''Every man has a right, under the law, as between himself and others, to full freedom in disposing of his own labor or capital according to his own will, and any one who invades that right without lawful cause or justification commits a legal wrong, and if followed by an inquiry caused in consequence thereof, the one whose right is thus invaded has a legal ground of action for such wrong.

''It is now well settled that the privilege of contracting is both a liberty and a property right. Liberty includes the right to make and enforce contracts, because the right to make and enforce contracts is included in the right to acquire property. Labor is property. To deprive the laborer and the employer of this right to contract with another is to violate Section 2 of Article II of the Constitution of Illinois, which provides that no person shall be deprived of life, liberty or property without due process of law. It is equally a violation of the Fifth and Fourteenth Amendments of the Constitution of the United States, which provide that no person shall be deprived of life, liberty or property without due process of law, and that no state shall

deprive any person of life, liberty or property without due process of law, nor deny to any person within the jurisdiction the equal protection of the laws."

On pages 29 and 30, Sections 45 and 58, are other restrictions which have, by some courts been held to be lawful, but by the majority of decisions held to be illegal; I will not take time to read them.

On page 30, Section 53, this organization places limitations upon its members as to working in factories where machinery is used:

"That no member of this association will be allowed to assist or try to operate any iron man, machine or invention, for the purpose of making window glass, except it be under the protection of the executive board or with the consent of the same. For violation of the above a member or members shall be fined, suspended or expelled from the association, as the executive board may decide."

The use of machinery, when it multiplies the products of labor, is in the interest of labor, and is in the interest of the general welfare; any provision, any contractual obligation which stands athwart this principle stands athwart the policy that the law enforces for the public welfare.

I have heard it stated—I do not know how true it is, perhaps approximately right—that the machine energy in use in the United States amounts to one hundred millions of horse power, doing the work of eight hundred millions of men, and that this machinery is operated by twenty millions of men. So that, by the use of machinery one man is enabled to do the work and make the production of forty men without machinery. This is in the interest of everybody, because it augments the fund total, that is the product of labor.

Then this organization undertakes to control the manufacturers. I read Section 9 on page 4 of the by-laws:

"Every manufacturer, engaging members of the Amalgamated Window Glass Workers of America, shall sign the agreement of the association before the member will be allowed to work."

Page 27, Section 36:

"Each manufacturer shall be compelled to employ a boss cutter; said boss cutter to be a member of the Amalgamated Window Glass Workers of America, and he shall divide and distribute the orders among the cutters."

Every manufacturer is compelled to employ a boss cutter who is to be subject to the direction of this association. And on page 28, Sections 40 and 41:

"Any manufacturer introducing into his flattening house, blow furnace, tanks, or pots, new inventions, supposed improvements, shall, so long as said inventions or improvements continue to be an experiment, or until it shall have been demonstrated that it will not be a loss to the workmen whose work is or may be affected by said machine or invention," etc.

Section 41:

"All ten-pot furnaces shall be required to employ three flatteners, and no flattener shall flatten more than four pots, unless the president and executive board deem it absolutely necessary."

Now, these provisions, if enforced, would impair the right of the employer to conduct his business according to his own notion of fitness. And it impairs the commercial freedom that belongs to the employer just as industrial freedom belongs to the individual laborer. This is outside of the membership of this association, and beyond any legitimate purpose that it can have, to-wit, the benefit of its membership.

. I have noted, and intended to read from, but I will not take the time to do so, the 152d New York, 36 to 38; 207 Pa. State, page 80; 192 Mass., 580.

The by-laws of this association contain a multitude of provisions, not referred to by me because it would take too long, that give the organization absolute control of every member as a glass worker, and places him in complete servility to it. Every member of this body has surrendered his individuality, and his industrial freedom, and is no longer a personal factor in the industrial world. This is violative of fundamental personal rights, and of public rights, and is therefore unlawful.

This association undertakes to exclude all glass workers not members, and to limit manufacturers to employment of none but its members. This is deemed to constitute a monopoly. I read from 93 Mo. Appeals, pages 390, 391 and 392, from the opinion:

"In respect to the second contention of the defendants that the association is an unlawful one, being in restraint of trade, it will suffice to refer to its by-laws in support of this contention. The by-laws impose on the members of the association a most slavish observance of the most stringent rules and regulations in the restraint of trade; so strict and far-reaching are they that no musician in the city of St. Louis, and for that matter in any other city of the country, can find employment as a musician unless he is a member of the association. Such confederation and combination is a trust, pure and simple. Combinations and confederations in restraint of trade have been denounced by the common law from time immemorial as being against public policy. The Legislature of this state, and the Legislature of most, if not all, of the other states have made trusts an object of special legislation with a view to their suppression and prevention. The plaintiff is in the attitude of asking the court to keep him where the law says he has no right to be, and to retain him in a position where he may aid in the support and maintenance of an illegal association, and where he may continue to support and keep up a monopoly of the services of musicians.

"Courts have never dealt with monopolies, except to restrain or destroy them, and we decline to depart from this wholesome rule in this case and reverse the judgment with directions to the trial court to dissolve the injunction and to dismiss plaintiff's bill."

And on the motion for rehearing, Judge Bland, the presiding judge, made this brief announcement:

"The learned counsel for the respondent, in his motion for rehearing, seems to have misconceived both the law and the spirit of the opinion delivered in this case. The opinion does not, as counsel for respondent contends, denounce trade unions. The court was not dealing with trade unions as such, but with a monopoly styling itself a trade union. Trade unions are authorized by our statutes and are approved and supported by the enlightening sentiment of all right thinking men, and their benefit both to their members and the general public are seen and appreciated by every unprejudiced mind. But when a so-called

trade union becomes a tyrannical master over its members and monopolizes a trade, for the protection of which it was ostensibly organized, it puts itself beyond the pale of the protection of the courts and outside of the statutes authorizing trade unions; and no member of such union can have any standing in the court of equity where he seeks to enfore the monopolistic features and business of the organization. The court found the unfortunate respondent in this situation, and while we recognize that the order to which he belonged had unjustly and arbitrarily dismissed him from the organization, we find ourselves unable to offer him any relief, for the sole reason that he asked the court to sustain and uphold a monopoly, and not because he belonged to a labor union.''

I conclude that the Amalgamated Window Glass Workers of America, by its expressed purposes and its conceded methods, exerts an influence, and has a tendency, against the public policy of the state, and is therefore an illegal organization.

Finding that the Amalgamated Window Glass Workers of America is an unlawful organization, because its purposes and its methods tend against the public welfare, it is too plain to require comment, or the citation of authorities, that the plaintiffs are in pari delicto, and that they do not come into court with clean hands. Indeed, this was not seriously controverted in argument.

Stating it in the ensemble, the attitude of the plaintiffs is about this:

We went into this oganization to co-operate in these unlawful purposes, by the use of these unlawful methods. We are getting the worst of it; and if we simply withdraw from the association, leaving it free to exert its power and enforce its tactics against us, we shall only make our situation worse. We therefore invoke the aid of the court to pull down the structure that we have wrongfully helped to erect.

Such attitude of plaintiffs does not commend them to the court; and if the scope of this case is limited to the granting of relief to the plaintiffs, they must go out of court, and must be left to bear the ills which their own wrongs have helped to bring upon them.

This doctrine is established in the 46th Ohio State, page 207, which I will not now stop to read.

But it is claimed that inasmuch as this action is not to *enforce* an illegal contract, but is in *disaffirmance* of an *executory* contract, the court should entertain the action, not for the benefit of the plaintiffs, but in the interest of the public.

Anomalous and paradoxical as it would seem to be, to require actions to be brought in the name of the real party in interest, and limited, as to parties, to those who are interested in the subject of the controversy, and limiting the judgment to the parties that are before the court—I say anomalous and paradoxical as it would seem, to impose these requirements, and then, finding that the parties to the action are not entitled to relief, to carry on the action in the interest of the public, I think it is a well-settled principle of judicial procedure, and of equity jurisprudence, that this may be done in proper cases.

I read an extract from an opinion in the 103d U. S. Reports, at pages 58 and 59:

"And this distinction is taken in the books that where the action is in affirmance of an illegal contract, the object of which is to enforce the performance of an engagement prohibited by law, clearly such an action can in no case be maintained, but where the action proceeds in disaffirmance of such a contract, and instead of endeavoring to enforce it, presumes it to be void and seeks to prevent the defendant from retaining the benefit which he derived from an unlawful act, then it is consonant to the spirit and policy of the law that the plaintiff should recover."

And there is a case in Missouri where a member of an association of musicians sought his restoration to membership. He was asking that an unlawful organization be recognized to the extent of restoring him to membership. And the court finding that the organization was unlawful, did not help him to membership in the unlawful organization in order that he might help carry on its unlawfulness.

Pomeroy says:    (Code, Section 941):

"To the foregoing rules there is an important limitation. Even where the contract and parties are *in pari delicto,* the courts

may interfere from methods of public policy. Whenever public policy is considered as advanced by allowing either party to sue for relief against the transaction, then relief is given to him. In pursuance of this principle, and in compliance with the demand of a high public policy, equity may aid a party equally guilty with his opponent, not only by cancelling and ordering the surrender of an executory agreement, but even by setting aside an executed contract, conveyance, or transfer, and decreeing the recovery back of money paid or property delivered in performance of the agreement. The cases in which this limitation may apply, and the affirmative relief may thus be granted and include the class of contracts which are intrinsically contrary to public policy—contracts in which the illegality itself consists in their opposition to public policy, and in other species of illegal contracts, in which, from their particular circumstances, incidental and collateral motives of public policy require relief.''

I have a number of citations to the same effect; I will not take time to read them. I will read only one other. I read from the 15th Ohio Decisions, page 21:

''It is urged for the defendant, however, that conceding the illegality of the resolutions of the defendant, the plaintiff can not complain of them for the reason that he assisted in the passage of same, and in inflicting the penalties thereby provided upon other members; that he is *in pari delicto* with the defendant; and he does not therefore come into a court of equity with clean hands, and therefore can have no relief.

''The principle is often broadly stated that when parties enter into an illegal agreement the courts regard them as *in pari delicto* and consequently leave them where they find them. affording no relief to either of them in law or equity. But this statement is too broad as it is subject to a number of exceptions, one of which is that where a contract prohibited by law is not *malum in se* but *malum prohibitum*, and has not been fully executed, either party may rescind the contract and have relief against it both in law and equity. The principle upon which the exception is made is that public policy is best subserved by granting a *locus penitentiae* to a party, and by permitting him to disaffirm the contract prevent the execution of it.''

I think the case made in this petition comes within that doctrine. It stands as an exception to the general rule that parties

*in pari delicto* can not have relief in a court of justice. This contract is still executory; the whole thing is *in fieri*—the wrongs that may be committed against public policy are still to be committed; it is to be perpetuated; it is executory. And this action is not based upon any right of these plaintiffs as members of this association, it is not to perpetuate or to recognize or enforce this contract between the members of a society; it is in disaffirmance of a contract. It is to accomplish its destruction and thereby relieve the public, as well as these plaintiffs, from the consequences of a continuation of this society and the perpetuation of the wrongs against the public that its provisions would work.

While these plaintiffs can not have relief in favor of their individual rights, I think that the court may, in a case of this kind, and in this case, grant that relief because thereby the public good may be promoted. I think it is an organization of such scope, such character, that the court when it gets jurisdiction of the organization and its membership, should in the interest of the public, entertain the action and grant such relief as will promote the public good—protect the public, even though it results in giving to these plaintiffs relief that as plaintiffs they are not entitled to.

Now, just what relief may be given under this petition—what relief ought to be given, what decree, or judgment, ought to be rendered in the case I do not think I am called upon, in the consideration of this demurrer, to determine. The court that tries the case will have that question, if the action is entertained, and I leave that question for the court when the case is tried, if it shall be tried.

For these reasons the demurrer, in both branches, is overruled.

This cause now coming on for trial (January 24, 1908), the plaintiffs move for judgment on the petition. As the case now stands, the petition stands without answer. There is no defense here, but perhaps there should be formal proof as to the material

averments of· the petition. There are two questions presented: First, what shall be the decree, so far as its effect upon the society is concerned; and second, what shall be its effect, if any, upon the fund in the treasury of this society.

It is claimed on behalf of the defendants that all that the court is interested in, and all that the court is authorized to do, looking now to the public interest, may be accomplished by eliminating the illegal features of this contractual relation, by injunction, and leaving the society intact.

At the former hearing, certain provisions of the by-laws were pointed out as illegal, and as giving character to the whole contractual relation—not all that were held to be illegal or found to be illegal were adverted to at that time, and need not be now. Of course, there are provisions in the articles of amalgamation, and there are provisions in the by-laws, that are entirely legal. It is suggested that if these provisions be left standing, and only the noxious provisions be eliminated by enjoining the society from operating under them, or any of them, that will accomplish all that is now sought to be accomplished by a decree.

I do not think this can be done, and for several reasons I think it would be in effect the making by the court of a new contract for the members of this organization. A contract expurgated in that way would not be the contract that they entered into. There would then stand only a fragmentary part of the contract that was agreed to. It would lack the consent of the members, which is an indispensable prerequisite to a contract. No member of this organization has consented to enter into the contractual relations that would then exist; they could not be bound by it as their contract. The only jural relations these members have, is a contractual relation, arising from the terms and conditions contained in the documents to which they have consented. I think it would destroy the contract, and what would remain, as I have said, would lack the indispensable contractual element of consent of the parties. The court is never authorized to make a contract; the court may enforce a legal contract; the court may undo an illegal contract; and that is as far as it can go.

Another objection to such form of decree would be, that there *is* no legal and valid part of this contract. The contract was entered into as an entirety. All the documents, resolutions, etc., adopted and agreed to, enter into it and form the contract; on all of them rests the contractual relation among the members of this association. The illegal features, the illegal provisions in this entire contract are so numerous, and they so permeate the whole contract that the entire contract is vitiated. It can not be said that some of these things make a valid contract. There never has been, and there is not now, any legal contract or part of a contract existing. There is no legal contractual relation here to be left undisturbed. There was no legal contract in the beginning; *ergo*, there was no contract in the beginning, and there is therefore no contract to leave in force. If any material part of this contract should be eliminated by injunction, then there is nothing left to which the members have consented; there is nothing left that ever had in law any validity. You can not inspire this contract with validity by eliminating some parts of it. If such disposition of the case could be made, if I believed it could be made, I would be glad to leave such portions of the contract as are not vulnerable, stand, and leave the organization intact, resting upon such parts of an attempted contract. I can see no ground upon which that can be done legally. It is not the illegal features of the contract that the law condemns, it condemns *the contract relation,* because of its illegal features. As I said, these illegal features permeate the whole contract, and give to it its illegal character.

It is suggested (and I am reminded that on a former occasion I said) that labor organizations are to be fostered. I believe that not only are labor organizations legal, but I think it has come to be the policy of the law, and of the courts in the administration of the law, to foster and to promote labor organizations. I think they are indispensable. I think when they are legal they are promotive of public good. They are not only a benefit to the membership of the organization, but in taking the broad view of the matter, I think they are really promotive of

the public welfare. I believe that it is the tendency of the law, and the tendency of its administration, to promote and foster such organizations. But a labor organization is promotive of the public welfare, and is to be protected and maintained in the administration of the law, only when it is a legal organization. If in its purpose and its methods it contravenes public policy, then of course it ought not to be promoted.

I think that the view that has been suggested can not be operative in this case, where it is found that the organization itself, in its fundamental contractual basis, is against public policy. And any decree that may be made in this case must not be mistaken as a decree aimed at labor organizations; it can be aimed only at this organization, and because of the illegality that enters into its contractual basis.

So I do not see how I can do otherwise than to dissolve this organization. I would not make such decree if I did not feel compelled to do it. Taking the view of this case that I have taken—and I have arrived at it after full argument and careful consideration—I think it is the only decree that can be made. Nothing short of this will maintain the law; nothing short of this will promote public policy in this instance.

Then, subject to the hearing of proof, and if the proof shall support the material allegations of the petition, the decree will be that this organization is dissolved.

There remains the disposition of the funds found within this organization, if they are to be dealt with. This is a matter to which I have given much less consideration than to the other questions.

One of two courses must be taken. Either the court must take possession of this fund and dispose of it, or it must be left in the hands of whomsoever may now have the possession of it.

Is the public interested in the fate of this fund? Not directly—no part of it can go for any public purpose. It is a fund that has been contributed, I take it, by all the membership. Now, the court dissolves this organization. It has a treasurer; it has a fund. It will no longer have a treasurer; in fact, there is no longer to be any organization. Here is a fund that is left

without any legal existence; and it is left so as the result of the decree of the court. This fund is no longer needed for the purposes for which it was contributed. It can no longer be used for the purposes for which it was contributed, because these purposes are found to be illegal, and the use of the fund for such purposes is at an end. There is no longer any society to control it; there are no longer members of the society to be benefitted by it; the fund is aimless; it is without an owner and without a legal custodian. The decree of the court brought about this situation. Now, is the court to leave this money in the hands of those who happen to have it? Suppose it does? Some of this fund, possibly all of it, is in some bank or banks; to whom are they to pay it? How can they be compelled to pay it? Who has any authority to receive it from the banks?

It is stated, and stated in response to an inquiry from the court, that the fund is deposited in the name of the society. Now, the society is dissolved. How is anybody to collect this fund from the banks? And what for? Why should anybody collect it? Why shouldn't the banks be just as much entitled to hold it as anybody else would be entitled to demand and receive it?

As I said before, this is the situation now of the fund, brought about by the decree of the court dissolving the association. Now, isn't it an incident and a part of the dissolution of the society to make some disposition of this fund? Does not that belong to the dissolution? Is the court going to destroy the society and set this fund adrift? It seems to me that would be outrageous; that would be a wrong to somebody, and to whom? To nobody in the world except the men who paid in this fund. Nobody has any shadow of claim to it now except the men who contributed it. The officers of the society have no right to it, because they are no longer officers. The society would not longer have any right to it—there is no society.

In the last analysis, what in fairness and reason, ought to be done with this money? The banks have no right to keep it; the officers have no right to keep it. The only persons who can have any right to it are the persons who paid it in. And such

right does not arise by virtue of any legal effect that the organization ever had; it is outside of that. They are not entitled to it because they are members or were members of the society when it was dissolved; that is not the basis of their right. The basis of their right is, that they have contributed it. It was their money. It was paid over in good faith, but for a purpose that is found now to be unlawful. Perhaps they could not recover it—I am not sure about that. It was suggested in argument, that without our statute authorizing the recovery of money lost at gaming, such money could not be recovered. I think that is the law. And why? Not because the man who won it at gaming acquired any right to it, but it is because the gaming transaction has been ended; the illegal contract has been executed; and is no longer executory.

Suppose I am the loser in a game of chance, and instead of paying over the money I give my note for it, the contract is not executed yet; I haven't paid the money that was lost and won. Such note could not be collected; it was for an illegal consideration; that part of the gaming contract is executory, and it could not be enforced. But this money does not have the relation that money lost and paid in gaming would have, without our statute. In the one case there is an executed illegal contract, and there is a custodian of the money; he owns it. The court will not interfere with it, the illegal contract having been executed. Here is money contributed and retained in custody for certain purposes; it has never been applied to those purposes; it is still on hand. It has simply been contributed for a purpose for which it has not yet been used. The purpose now vanishes, it never can be accomplished, or carried out. The custodian of the money is no longer the legal custodian of it for the purposes for which it was contributed. And I think it is in the hands of the court to be dealt with as a part, and an inseparable part, of the decree of dissolution.

I have no doubt there may be obligations in favor of persons who have a legal right to payment out of this fund. What the character of such obligations may be, I do not know. But there may be obligations that have a right to payment out of this fund.

Then, whatever is left ought to be distributed to the people who produced it, in some equitable proportion; probably in the ratio in which they contributed to it.

Whether this is a proper case for the allowance of attorney's fees out of this fund, I do not decide; it is not necessary now to decide that.

Whether the custodian to take charge of this fund would.be technically a receiver, whether this appointment would come within the statute with regard to receivers, I do not know; but certain it is that it is within the power of the court to appoint a custodian of the fund—call him receiver or trustee, or whatever you may. When the court comes into control of a fund that must be administered and distributed, it certainly is within the power of the court to appoint a custodian of the fund, to receive it, and hold it, and disburse it, under the order of the court— call such person what you may.

If the proof to be offered shall sustain the material averments of the petition, there will be a decree dissolving this organization, for reasons that ought to be stated, of course, in the decree, and appointing some person to take charge of the fund in the hands of the society, and to make disbursements therefrom and distribution thereof under order of the court.

Upon the hearing of evidence, the organization was dissolved, and a receiver appointed.