# Fowler and Vankirk, his assignee, *versus* Scully, for use of First National Bank of Pittsburg.

1. Fowler gave to a national bank, &c., not then being indebted to it, a mortgage to secure the bank for notes, &c., *thereafter* to be discounted for him. *Held*, that under the National Currency Act, June 3d 1864, the mortgage was void.

2. Corporations both for their powers and the *mode* of exercising them depend upon the statute creating them.

3. Under the Currency Act no other than personal security can be taken by a bank for a loan.

4. Lending money by a national bank on mortgage or real estate security is *ultra vires* and forbidden.

5. The 52d section of the National Currency Act refers to mortgages taken for pre-existing debts.

6. Fowler gave a mortgage to a national bank to secure future advances and afterwards assigned for the benefit of creditors. *Held*, that the assignee might resist the mortgage on the ground of its invalidity.

7. The mortgage being void, no action on it could be sustained.

8. Courts, even with the consent of the defendant, will not enforce a contract in violation of a statute although not expressly made void.

9. If a plaintiff cannot open his case without showing that he has broken the law, courts will not assist him to recover, whatever his justice may be.

November — 1872. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the District Court of *Allegheny county*: No. 171, to October and November Term 1871.

On the 31st of May 1871, John D. Scully, in trust for The First National Bank of the city of Pittsburg, issued a scire facias sur mortgage against Silas S. Fowler with notice to William Vankirk, terre-tenant.

The mortgage, dated October 21st 1869, was between Silas S. Fowler and John Scully, in trust for The First National Bank of the city of Pittsburg. It recited: "Whereas, the said bank hath agreed to discount for said Fowler an amount in the aggregate not exceeding $100,000, such negotiable business paper as he shall offer for that purpose, consisting chiefly of bills of exchange, or drafts drawn by him on his customers on account of work, &c., done, and orders filled by him for them from time to time in the course of his business; and Whereas, said Fowler wishes to avoid the necessity of procuring the additional endorsement to said paper by a third party." * * *

"And in consideration of the premises, and for the better securing the said drafts, bills, &c., and other negotiable paper unto" the bank, Fowler conveyed the premises named in the mortgage to Scully. The defeasance was the payment by Fowler to the bank of "the aforesaid debt or sum of all bills of exchange, drafts and other negotiable paper discounted by said bank for said Fowler, as aforesaid, on the days and times mentioned and appointed for the pay-

[Fowler *v.* Scully.]

ment thereof, according to the tenor and effect of said bills, drafts, &c., and in satisfaction and discharge thereof;" and then, "as well this present indenture, and the estate hereby granted, as the said recited bills, drafts, &c., shall become void, &c.," with a further proviso that a scire facias might issue upon default of payment for 30 days after maturity," of any bill, draft or other negotiable paper discounted by the bank for said Fowler."

The plaintiff's affidavit of claim was upon a large amount of paper discounted for Fowler contained in a schedule attached to the affidavit. The first was discounted April 23d 1870, and the last October 22d in the same year; the whole amount, principal, interest and costs to April 30th 1871 was $77,452.87.

The affidavit further set out "that all said bills of exchange were discounted by said bank for said Silas S. Fowler, in pursuance of and under the said recited mortgage, and that they were severally duly presented for payment according to the tenor thereof, and payment by the respective drawees and acceptors was duly demanded and payment was refused; of all which due notice was given the drawer, the said Silas S. Fowler. Said bills of exchange remain wholly unpaid, and they are all overdue more than thirty days."

The affidavit of defence was as follows, viz.:—

"William Vankirk, terre-tenant, and owner in fee of the real estate described in the mortgage sued on in the above case, under and by virtue of a certain deed of assignment duly executed by the said Silas S. Fowler, bearing date the 7th day of November, 1870, &c., says, that he is advised and believes he has a just and full defence to said action, consisting in this, to wit, that said mortgage was given at the time of its date, by the said Silas S. Fowler to the said First National Bank, as security, not for any previous indebtedness of the said Silas S. Fowler, but for future advances and for liabilities *thereafter* to be contracted, and was given for no other purpose, as by said mortgage will more fully appear. That said bank was created under, and derives all its powers and privileges from, the Act of Congress relative to banking companies, approved the 3d day of June 1864. And deponent is advised and believes that by the 28th section of said act the said bank was prohibited from taking said mortgage, and that according to the provisions thereof the same was and is utterly null and void."

The court (Hampton, P. J.) on the 11th of September 1871, entered judgment for the plaintiff for $79,118.70, for want of a sufficient affidavit of defence.

The defendant took a writ of error, and assigned for error, entering judgment for want of a sufficient affidavit of defence.

The following are sections of the National Currency Act of June 3d 1864: 2 Bright. U. S. Dig. 53, 57, 58, 63, 64, pl. 8, 28, 29, 52, 53, 54.

[Fowler *v.* Scully.]

"Sect. 8. Every association formed pursuant to the provisions of this act, shall, from the date of the execution of its organization certificate, be a body corporate, but shall transact no business except such as may be incidental to its organization and necessarily preliminary, until authorized by the comptroller of the currency to commence the business of banking. Such association shall have power to adopt a corporate seal, and shall have succession by the name designated in its organization certificate, for the period of twenty years, * * * by such name it may make contracts, sue and be sued, &c., * * * and exercise under this act all such incidental powers as shall be necessary to carry on the business of banking by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin and bullion; by loaning money on personal security; by obtaining, issuing and circulating notes according to the provisions of this act; and its board of directors shall also have power to define and regulate by by-laws, not inconsistent with the provisions of this act, &c. * * * and its usual business shall be transacted at an office or banking-house located in the place specified in its organization certificate.

"Sect. 28. It shall be lawful for any such association to purchase, hold and convey real estate as follows:—

"First. Such as shall be necessary for its immediate accommodation in the transaction of its business.

"Second. Such as shall be mortgaged to it in good faith by way of security for debts previously contracted.

"Third. Such as shall be conveyed to it in satisfaction of debts previously contracted in the course of its dealings.

"Fourth. Such as it shall purchase at sales under judgments, decrees or mortgages held by such association, or shall purchase to secure debts due to said association.

"Such association shall not purchase or hold real estate in any other case or for any other purpose than as specified in this section; nor shall it hold the possession of any real estate under mortgage, or hold the title and possession of any real estate purchased to secure any debts due to it for a longer period than five years.

"Sect. 29. The total liabilities to any association, of any person, &c., for money borrowed, &c., shall at no time exceed one-tenth part of the amount of the capital stock of such association actually paid in: *Provided*, That the discount of bonâ fide bills of exchange drawn against actually existing values, and the discount of commercial or business paper actually owned by the person, &c., negotiating the same, shall not be considered as money borrowed.

"Sect. 52. All transfers of the notes, &c., owing to any association, or of deposits to its credit; all assignments of mortgages, &c., to prevent the application of its assets in the manner prescribed by this act, or with a view to the preference of one creditor

[Fowler v. Scully.]

to another, except in payment of its circulating notes, shall be utterly null and void.

" Sect. 53. If the directors of any association shall knowingly violate, &c., any of the provisions of this act, all the rights, privileges and franchises of the association derived from this act shall be thereby forfeited. Such violation shall, however, be determined and adjudged by a proper circuit, district or territorial court of the United States, in a suit brought for that purpose by the comptroller of the currency, in his own name, before the association shall be declared dissolved.

" Sect. 54. * * And the association shall not be subject to any other visitorial powers than such as are authorized by this act, except such as are vested in the several courts of law and chancery."

*G. Shiras, Jr.*, and *Hopkins & Lazear*, for plaintiff in error. —The mortgage under the provisions of the Act of Congress is absolutely void, and therefore a suit could not be maintained on it : E. Anglian Railway v. E. Counties Railway, 7 Eng. L. & E. 505 ; McGregor v. Railway, 16 Id. 180 ; Norwich v. Norfolk Railway, 30 Id. 120 ; Seneca Bank v. Lamb, 26 Barb. 695 ; Leavith v. Palmer, 3 Comstock 19 ; Tallmage v. Pill, 3 Selden 328 ; Swift v. Beers, 3 Denio 79 ; Tyler v. Gates, 3 Barb. 226 ; Green v. Seymour, 3 Sandford 286 ; Chilicothe Bank v. Swayne, 8 Ohio 280 ; Miami Exporting Co. v. Clark, 13 Id. 1 ; New York Ins. Co. v. Ely, 5 Conn. 560 : Wheeler v. Russell, 17 Mass. R. 258 ; White v. Franklin Bank, 22 Pickering 183 ; Merrith v. Lambert, 1 Hoffman Ch. R. 166 ; Pearsoll v. Chapin, 8 Wright 9 ; Columbia Bank v. Haldeman, 7 W. & S. 233 ; Mitchell v. Smith, 1 Binney 110 ; Biddis v. James, 6 Id. 321 ; Weeks v. Lippincott, 6 Wright 474 ; Burkholder v. Beetem, 15 P. F. Smith 496 ; U. States Bank v. Owens, 2 Peters 537 ; Augusta Bank v. Earle, 13 Id. 519 ; Perrine v. Ches. & D. C. Co., 9 Howard 172 ; Cappell v. Hall, 7 Wallace 542.

*M. W. Acheson*, for defendant in error.—A mortgagee has no estate, property or interest in the land until he takes possession of the property : Myers v. White, 1 Rawle 353 ; Craft v. Webster, 4 Rawle 255 ; Wilson v. Shoenberger, 7 Casey 295 ; Moore v. Cornell, 18 P. F. Smith 320.

There is no *express* prohibition to be found in the Act of Congress from taking a lien by mortgage : Act of June 3d 1864, *supra.*

The object of the restraining clause of the statute is to prevent an inordinate proportion of real estate being held by banking companies, and to prohibit them from withdrawing their capital from their legitimate business and engaging in land speculations : Silver Lake Bank v. North, 4 Johns. Ch. R. 373 ; Baird v. The Bank of Washington, 11 S. & R. 411, 417. A bank may receive and

[Fowler *v.* Scully.]

hold bonds and mortgages as securities for its debts: Trenton Banking Co. *v.* Woodruff, 1 Green (N. J.) Ch. R. 117; Bates *v.* The Bank, 2 Alabama R. 465; Blunt *v.* Walker, 11 Wis. 334.

Every corporation has, at common law, a right to take and hold property real and personal: Ang. & A. on Corp., sec. 145; 2 Kent Com. 335. The mortgage here was for a debt " previously contracted " within the meaning of the second clause of the 28th section of the Act of Congress: Silver Lake Bank *v.* North, *supra.*

There is a distinction between a mortgage to cover future advances at the *discretion* of the mortgagee and one to cover advances which he is *bound by contract to make :* Ter Hoven *v.* Kerns, 2 Barr 96; Moroney's Appeal, 12 Harris 372; Parmentier *v.* Gillespie, 9 Barr 86. The previous agreement by the bank to discount Fowler's paper was equivalent to discounts then actually made.

Equity will regard the mortgage as *redelivered anew* on each occasion when the bank discounted a bill for Fowler: Rex *v.* Ins. Co., 2 Phila. R. 357; Purser *v.* Anderson, 4 Edwards's Chancery Rep. 17; Valk *v.* Crandall, 1 Sandf. Ch. (N. Y.) 179; Uhler *v.* Applegate, 2 Casey 140. In the absence of any complaint by the government, and in the absence of any defence by Fowler himself, it lies not in the mouth of Vankirk—a mere volunteer—to assert that the bank has no equities: Knowles *v.* Lord, 4 Wharton 500. In re Roberts, 2 Barr 371; Twelves *v.* Williams, 3 Wharton 485; Foulke *v.* Harding, 1 Harris 242; Mellon's Appeal, 8 Casey 121; Breading *v.* Boggs, 8 Harris 33. The utmost that can be said is, that the bank in taking this mortgage acted in excess of its powers to acquire property. The government alone can complain : Silver Lake Bank *v.* North, *supra ;* P. & C. R. R. Co. *v.* Allegheny County, 13 P. F. Smith 126; Leazure *v.* Hillegas, 7 S. & R. 313; Goundie *v.* Northampton Water Co., 7 Barr 233; Baird *v.* The Bank of Washington, 11 S. & R. 411; Steamboat Co. *v.* McCutcheon, 1 Harris 13; Farnham *v.* D. & H. Canal Co., 11 P. F. Smith 265; Chester Glass Co. *v.* Dewey, 16 Mass. 94.

A contract forbidden by the charter of a company is not necessarily void, except in a direct proceeding by the state: Grand Gulf Bank *v.* Archer, 8 Smedes & M. 151; Steam Nav. Co. *v.* Weed, 17 Barbour 378; Insurance Bank of Columbus *v.* U. S. Bank, 7 Pa. Law Jour. 129, 145; Lagow *v.* Badollet, 1 Blackf. 416; Bank of South Carolina *v.* Hammond, 1 Rich. 281; Southern Life Ins. & Trust Co. *v.* Lanier, 5 Fla. 110; Wooster Bank *v.* Stevens, 1 Ohio St. R. 233; Richmond Bank *v.* Robinson, 42 Maine 589; Parrish *v.* Wheeler, 22 N. Y. 494.

The opinion of the court was delivered, January 6th 1873, by

AGNEW, J.—The First National Bank of Pittsburg asked the District Court to enforce by scire facias the payment of a mortgage for future advances. The defendant, the owner of the mortgaged

[Fowler *v.* Scully.]

land, asserts that the mortgage is forbidden by the Act of Congress, which confers upon the bank its charter and all its powers. The simple question is, Is the mortgage valid or void; and if void will the law enforce it? In deciding this question, we must be guided by the Federal laws and Federal precedents, for the subject is one of. Federal origin and Federal control. The plaintiff is a corporation created and governed by the Act of Congress, approved the 3d of June 1864, commonly called the National Bank Act. What is the Federal rule to be applied to such a corporation? In the Bank of U. S. *v.* Dandridge, 12 Wheaton 64, Justice Story lays down this rule : " Whatever may be the implied powers of aggregate corporations by the common law, and the modes by which these powers are to be carried into operation, corporations created by statute must depend, both for their powers and the *mode of exercising them*, upon the construction of the statute itself." For this he cites the following language of Chief Justice Marshall, in Head *v.* Prov. Ins. Co., 2 Cranch 127 : "Without ascribing to this body, which in its corporate capacity is the *mere creature of the act* to which it owes its existence, all the qualities and disabilities annexed by the common law to ancient institutions of this sort, it may correctly be said to be *precisely what the incorporating act has made it;* to derive all its powers from that act and to be *capable* of exerting its faculties *only* in the *manner* the *act* authorizes." These propositions are repeated by himself in Dartmouth College *v.* Woodward, 4 Wheaton 636, and by C. J. Taney, in Bank of Augusta *v.* Earle, 13 Peters 587, and Penrise *v.* Chesapeake & Delaware Canal Co., 9 Howard 184. In our own state, the same doctrine is recognised in the case of a National Bank. Justice Strong said: " The bank is a creature of the act, dependent on it for all its powers, and *controlled by all the restrictions* which the act imposes:" Venango National Bank *v.* Taylor, 6 P. F. Smith 14.

This being the settled rule of interpretation, the question is: " Does the Act of Congress authorize or permit a National Bank to take a mortgage of lands, to secure the payment of future loans and discounts ?"

The banking powers of these associations are to be found in the 8th section, and are " to carry on the business of banking by *discounting* and *negotiating* promissory notes, drafts, bills of exchange and other evidences of debt; by buying and selling exchange, coin and bullion; by loaning money on *personal* security; by obtaining, issuing and circulating notes according to the provisions of the act." In view of the rule of interpretation of such charters given to us by the Federal courts, and the maxim *expressio unius est exclusio alterius*, the argument might close with the terms of the power to loan money on *personal* security : for agreeably to this rule and maxim, no other security than personal can be taken for money lent. This is the law of the bank's capacity, and of its

control. It accords also with the nature of banking as a business, which is precisely described in the language of the law itself; the *discounting* and *negotiating* of promissory notes, drafts, bills and other evidences of debts (meaning, of course, debts *ejusdem generis*, such as checks, certificates of deposits, &c.), the buying and selling of bills of exchange, bullion, and lending of money on personal security. The reasons are manifest. The business of a bank is commercial, not that of dealing in real estate, brokerage, &c. It, therefore, does not buy and sell real estate, ground-rents, mortgages, stocks, produce, &c.

It deals in commercial paper, on the security afforded by the personal responsibility of drawers, endorsers and payers, and this because banks are created for the purposes of trade, which require ready access to loans of money, and discounts on business paper made in the course of trade. Experience also has shown, that whenever banks abandon the legitimate practice of loaning or discounting on the well known standing of the parties to commercial paper; to lend money on the hypothecation of stocks, real estate, &c., alone in lieu of personal security, they enter an uncertain and unknown region of credit. The directors can well know or ascertain the standing of drawers and endorsers as men of capital or means in the community, but the moment they leave this plain field to enter the region of corporation stocks, real estate and liens, they take a leap in the dark, and must resort to outside agents, such as lawyers, brokers, &c. The internal affairs and condition of a corporation are known to few, while the security of a mortgage rests on both title and liens, requiring professional skill to explore them. The evident intent of Congress is, that National Banks should be institutions of commerce, not dealers in real estate, stocks or produce. What power there may be to accept an hypothecation of stocks in addition, and to strengthen a loan, we do not say. We are discussing the power conferred to *make* or *create* loans.

Another obvious purpose of confining their loans of money to personal security, is to prevent these associations from splitting on the rock which has ruined so many banks, to wit, that of lending too much of their capital to one person or firm. The 29th section provides: "That the total liabilities to any association, of any person, or of any company corporation, or firm for money borrowed, including in the liabilities of a company or firm, the liabilities of the several members thereof, shall at no time exceed one-tenth part of the amount of the capital stock of such association actually paid in." Thus Congress has prohibited an undue aggregation of its capital in single hands even though each note or bill may be well secured by the names upon it. Then what must we say of large aggregations of capital in the hands of one man, without personal security on the faith of an estimated value of real estate and the risk of title, and conflicting liens? In the present

case we see an aggregate of loans to Fowler, the mortgagor, of $76,303.59; the very mortgage reciting, that it was taken to dispense with personal security, and to extend to the sum of $100,000 How much the paid in capital of this bank is, we do not know. That such a transaction is contrary to the first principles of correct banking and to the charter, is obvious.

The intention of Congress is manifested by other features of the act. The 35th section declares: "That no association shall make any loan or discounts on the security of the shares of its own capital stock, nor be the purchaser or holder of any such shares, unless such security or purchase shall be necessary to prevent *loss* upon any debt *previously contracted in good faith*, and stocks so purchased or acquired, shall within six months from the time of its purchase, be sold or disposed of at public or private sale, in default of which a receiver may be appointed to close up the business of the association according to the provisions of this act." What is this, but to repeat to the bank—you must lend money only on personal security. Then comes the 37th section, prohibiting the bank from hypothecating its circulating notes to procure money to pay on its capital, or to be used in its banking operations or from using its notes so as in any form to increase its capital. These two sections, the 35th and 37th, when viewed together, teach another lesson, that these banks shall not live upon themselves, so that when compelled to wind up, creditors and stockholders shall not then discover that their apparent assets are composed of their own decayed viscera, instead of outside personal security. In this way only can the public be made safe against mismanagement.

Here the argument might rest, that the lending of money on mortgage or real estate security is *ultra vires* and forbidden. But Congress has left nothing to implication, and in the 28th section has said in what cases these banks may hold real estate, and has forbidden all others. The 28th section reads thus: "That it shall be lawful for any such association to purchase, hold and convey real estate as follows:" Then follow four numbered cases.

"*First.* Such as shall be necessary for its immediate accommodation in the transaction of its business.

"*Second.* Such as shall be *mortgaged* to it in good faith by way of security for debt *previously contracted.*

"*Third.* Such as shall be conveyed to it in satisfaction of debts *previously contracted* in the course of its dealings.

"*Fourth.* Such as it shall purchase at sales under judgments, decrees, mortgages held by such association, or shall purchase to *secure debts due* to such associations."

Now comes the prohibition against any other mode, and the appointed time such as shall have been legally acquired, shall be held.

"Such association shall *not* purchase *or* hold real estate in any

[Fowler *v.* Scully.]

*other case* or for any *other purpose* than as *specified* in this section,
nor shall it hold possession of any real estate under mortgage, or
hold the title and possession of any real estate purchased to secure
any debts due to it, for a longer period than five years."

Thus the section speaks to the bank in plain language—you
shall not purchase *or* hold real estate (besides your banking-house)
except in good faith to secure debts already contracted, and you
shall not hold in mortmain, for a longer period than five years,
that which you can legally take. This section is interpreted also
by the 35th section, which forbids the bank from taking its own
stock in security, except to prevent the loss of a debt *previously
contracted in good faith ;* and when stock shall be so taken it shall
not be held longer than six months. The language of prohibition
in the 28th section is quite clear. The bank "shall not purchase
*or* hold real estate in *any other case* or for *any other purpose* than
as specified in this section." The second specified case in this
section is, "such as shall be mortgaged to it in good faith by way
of security for debts *previously contracted.*" The law therefore
says plainly—you shall not hold a mortgage for future loans, for
that is another case.

If anything were wanting to make plain that which is clear, it
is the amendment of the 2d clause in the 28th section, and the de-
bate on it in the Senate. See Cong. Globe, April 26th 1864.
The amendment of the committee proposed to strike out, "for
loans made by such association in the usual course of its banking
business or for money due thereto," and to insert "for debts pre-
viously contracted," so as to make the clause read, "such as shall
be mortgaged to it in good faith by way of security for debts
previously contracted." At the call of Senator McDougall,
Senator Sherman explained the amendment of the committee to
allow the banks to take a mortgage for a pre-existing debt; but
not to loan money on real estate security; "Not to loan money on
mortgage?" said Mr. McDougall. Mr. Sherman again replied,
"They have no right to loan money upon mortgage; they must
take personal security, but after a debt is contracted they may, in
order to secure the debt, take a mortgage upon real estate." The
amendment was adopted, and the section now stands so.

It is argued, however, that a mortgage is not real estate, and
therefore it cannot be said that the bank holds real estate when it
holds a mortgage. The criticism is unsound, in forgetting that
the law is its own interpreter. A mortgage is one of the four
enumerated cases of which the law says the bank may hold real
estate as follows. Then follows the second case. It is also one
of the cases referred to when the law says, the bank shall not hold
in any other case than as specified in this section. The criticism
overlooks the fact also that the act as a Federal law is intended to
embrace the various conditions of the law of mortgage as realty

or personalty, in the several states. Even in Pennsylvania, where no court of chancery existed, though viewed only as a security for money, mortgages have been regarded as conveyances of real estate in form and subject to real estate remedies, as by ejectment, and by writ of waste.

The argument founded on the 52d section is unsound. The mortgages therein referred to are of course those which may be lawfully taken for pre-existing debts, which when found among the assets of the bank shall not be so assigned as to create preferences among creditors. The express prohibition of the 28th section cannot be repealed by this reference to mortgages in the 52d section, when so ready a meaning can be found for the latter.

It is a clear and incontrovertible position, therefore, that a National Bank cannot lend money on the security of a mortgage, and that its power to take and hold a mortgage is confined to the second case in the 28th section, for debts previously contracted.

It is argued that the mortgage before us is not a mortgage for future advances of money, because of the recital that the bank "hath agreed to discount for said Fowler an amount in the aggregate not exceeding $100,000, such negotiable paper as he shall offer for that purpose." It is said this is a covenant or obligation on part of the bank to loan that sum, and, therefore, the money to be lent is not a future loan. But this confounds distinctions and ignores facts. Treat the recital as a covenant to lend, still the loans and discounts to be made are future. The bank did not owe Fowler $100,000, and if it did, it had a security without a mortgage. The mortgage before us is not to secure a debt from the bank to Fowler, but a debt from Fowler to the bank, not exceeding $100,000, which is to consist of negotiable business paper discounted for him without the necessity of procuring the additional endorsement for said paper by a third party. If the bank is bound to make the discounts, the breach of the covenant would be followed by such damages only as Fowler could show. So much is drawn from the instrument itself. Then the fact is, as it appears in the schedule of discounts, that though the mortgage bears date the 21st October 1869, acknowledged and recorded on the same day, the first discount claimed under it was on the 11th April 1870, after which come twenty-two others, down to September 26th 1870. These are Fowler's debts to the bank, and they are all future to the mortgage. It would be an unmitigated fraud upon the Act of Congress if a bank could first covenant to lend the money, and then found upon its own covenant a mortgage to cover a line of future loans and discounts.

The distinction between a mortgage to cover future advances at the discretion of the mortgagee, and one to cover advances he is bound to make, recognised in TerHoven v. Kerns, 2 Barr 99, and other cases, has no bearing on the present question. That dis-

22 P. F. Smith—30

tinction was taken to regulate the rights and equities of lien-creditors among themselves, but does not change the nature of the advance itself. The advance in either case is future, but the effect upon the lien is different, just as the creditor was bound or not bound to make the advance.

It is further argued that to prevent injustice, equity will regard the mortgage as delivered anew, on each discount or advance. This will do *inter partes*, to prevent wrong; but such a fiction cannot confer a power upon a corporation, withheld from it by its charter. The error is in forgetting that this is a question of statute power and public policy, not of mere equity between the parties. Any want of corporate power might be supplied by this means, and the mere interests of parties be made to override the law.

Whether Vankirk, the voluntary assignee of Fowler, can set up the defence here, depends not on his character as a volunteer, but on the question whether the law will aid the plaintiff's recovery. If it will not, it is clear that Vankirk, as the owner of the estate by assignment, and under bond to administer his trust according to law, may and ought to defend for the interest of the creditors. This brings us to the second question stated in the outset of this opinion. The mortgage being void, will the law enforce it? All the authorities, English, Federal and state, say no. Mr. Powell, in his work on Contracts, p. 166, says, that all contracts repugnant to the welfare of the state, or against some maxim or rule in law, or in contradiction to some positive statute, are void. Then follow numerous instances. Mr. Comyn, in his work on Contracts, pp. 59 to 67, enumerates many statutes upon which contracts have been declared by the courts to be void as *mala prohibita*, and it is not essential that the statute itself should declare the contract to be void.

The doctrine that a contract in violation of the provisions of a statute, though not expressly made void by it, is null and will not be enforced by the courts, is very distinctly stated and sustained by authorities in the case of the Bank of the U. S. *v.* Owens, 2 Peters 538. Johnson, J., said: "No court of justice can in its nature be made the handmaid of iniquity. Courts are instituted to carry into effect the laws of the country; how can they become auxiliary to the consummation of violations of law? There can be no civil right where there can be no legal remedy, and there can be no legal remedy for that which is itself illegal." The same principles are recognised in Coppell *v.* Hall, 7 Wallace 558. Justice Swayne, commenting on the instruction of the court below, that the illegality had been waived by the act of the defendant, says, "In such cases there can be no waiver. The defence is allowed not for the sake of the defendant, but of the law itself." Again, "Whenever the illegality appears, whether the evidence

[Fowler *v.* Scully.]

comes from one side or the other, the disclosure is fatal to the case. No consent of the defendant can neutralize its effect. A stipulation in the most solemn form to waive the objection, would be tainted with the vice of the original contract, and void for the same reasons. Where the contamination reaches, it destroys. The principle to be extracted from all the cases is, that the law will not lend its support to a claim founded on its own violation." See also Bank *v.* Lanier, 11 Wallace 369. · And in Bank of Augusta *v.* Earle, 13 Peters 587, C. J. Taney says : " It may be safely assumed that a corporation can make no contracts and do no acts within or without the state which creates it, except such as are authorized by its charter."

Coming now to our own state, a long line of decisions testifies that our courts will not lend their aid to enforce illegal contracts. In Mitchell *v.* Smith, 1 Binney 110, a case of the sale and purchase of a Connecticut title to Pennsylvania lands, Shippen, C. J., says : " The contract is illegal, being founded on the breach of the law, and of consequence is a void contract and cannot be enforced in a court of law." In Siedenbender *v.* Charles, Administrator, 4 S. & R., it was held there could be no recovery upon a ticket in an illegal lottery. Tilghman, C. J., said : " I consider it perfectly settled that an action cannot be sustained, founded on a transaction prohibited by statute, although it is not expressly declared that the contract is void ;" p. 160. Yeates, J., said : " The principle of public policy is, that no court will lend its aid to a man who grounds his action upon an immoral or illegal act. Justice as between these individuals would require either payment of the money or reconveyance of the property, but principles of public convenience demand that the justice of the case shall yield to higher considerations, the operation of the precedent on public morals and the public interest. It is for these reasons courts of justice will not assist an illegal transaction in any respect." In Biddis *v.* James, 6 Binney 329, a case of lottery ticket also, C. J. Tilghman states the same doctrine in fewer words. There is, therefore, no room for equitable presumptions, or estoppels, in cases of illegal contracts. Without protracting the statement too much, I may refer to the following cases of illegal contracts, which the courts have refused to aid by a recovery : Maybin *v.* Coulon, 4 Dallas 298 ; Duncanson *v.* McLure, Id. 308 ; Badgely *v.* Beale, 3 Watts 263 ; Kepner *v.* Keefer, 6 Id. 231 ; Wagonseller *v.* Snyder, 7 Id. 343 ; Clippinger *v.* Hepbaugh, 5 W. & S. 315 ; Filson *v.* Himes, 5 Barr 452 ; Columbia Bank & Bridge Co. *v.* Haldeman, 7 W. & S. 233 ; App *v.* Coryell, 3 Penna. R. 494 ; Edgell *v.* McLaughlin, 6 Wharton 176 ; Brua's Appeal, 5 P. F. Smith 295. Two of these cases may be noticed particularly on the ground that the contracts were collateral to the illegal act, and that the court refused its aid.

Badgely *v.* Beale was for wages as a marker at an illicit billiard-table; and Columbia Bank, &c., *v.* Haldeman, was on a bond of indemnity to a stakeholder for paying over money won on a wager on an election. Here the bank, as plaintiff, asks to recover on an illegal mortgage; and it follows, from the doctrine stated, that the court will not assist the illegal act; and that the argument in regard to the state, being the only party to avail herself of the illegal forfeiture, has no place here. The defendant has the right to avail himself of the defence, and prevent a recovery. The doctrine of Leazure *v.* Hillegas, 7 S. & R. 313, and cases follow-ing in its track, is founded on the law of Pennsylvania as to cor-porations, that though they may *take* real estate, except for super-stitious uses, yet they cannot hold it in consequence of the statutes of mortmain, but as the title has passed into the corporation, it must rest there, till the state enforces the forfeiture. This is very clearly shown by C. J. Tilghman in that case. But in the case now before us, as we have seen, the Act of Congress forbids the taking of a mortgage, except as a security for debts previously contracted. The disability attaches therefore to the *acquisition*, and not to the retaining of the mortgage. The transaction is without authority and illegal from the start, and the law will not enforce it. The defendant may, therefore, defend against it, not because of his own merit, but because the law will not suffer itself to be prostituted. This being the rule, it only remains to state the test adopted. " The test (says Judge Duncan, in Swan *v.* Scott, 11 S. & R. 164) whether a demand connected with an ille-gal transaction is capable of being enforced at law, is whether the plaintiff requires the aid of the illegal transaction to establish his case. If the plaintiff cannot open his case without showing that he has broken the law, the court will not assist him, whatever his claim in justice may be upon the defendant." This test has been repeated in the following cases : Thomas *v.* Brady, 10 Barr 170 ; Scott *v.* Duffy, 2 Harris 20 ; Evans *v.* Dravo, 12 Id. 65. The mortgage of Fowler to the plaintiff is, on its face, a security for future advances, and the schedule of the debts claimed under it shows also their subsequent character. The plaintiff could not open its case, therefore, without disclosing that it sought the en-forcement of an illegal security—one forbidden by the law. The action must, therefore, fail.                    Judgment reversed.

SHARSWOOD and WILLIAMS, JJ., dissented.

March 12th 1873.   The Supreme Court awarded a *procedendo*.