458 A.2d 545

**FELD AND SONS, INC., T/A Today's Man and David Feld, David Klein, Alan Becker and Jake Jacobson, Individually, Appellants,**

v.

**PECHNER, DORFMAN, WOLFEE, ROUNICK, AND CABOT, a Pennsylvania Partnership and Stephen J. Cabot, Martin J. Sobol, Julius M. Steiner, John Dorfman, Lenard Wolfee, Sidney J. Smolinsky, Leonard Schaefer, Milton P. King, Walter Lazaroff, Jack A. Rounick, Charles W. Bowser, Emanuel A. Bertin, Edwin N. Barol, Barry H. Frank, and Daniel T. Berkley, indiv. and T/A Pechner, Dorfman, Wolfee, Rounick & Cabot, a Pennsylvania Partnership and Alan M. Dabrow, Barry F. Bevacqua, Robert J. Simmons, Kenneth M. Jarin, and Gerald R. Cureton, Individual Part Defendants.**

Superior Court of Pennsylvania.

Argued Nov. 3, 1982.

Filed March 25, 1983.

Petition for Allowance of Appeal Granted Sept. 30, 1983.

Petition for Allowance of Appeal Denied Sept. 30, 1983.

126

Steve Alexander, Philadelphia, for appellants.

Richard M. Shusterman and Morris R. Brooke, Philadelphia, for appellees.

Before SPAETH, ROWLEY and VAN der VOORT, JJ.

SPAETH, Judge:

This is an appeal from an order sustaining appellees' preliminary objections in the nature of a demurrer and dismissing appellants' complaint in trespass and assumpsit. Appellees were appellants' lawyers in a labor dispute. In proceedings before the National Labor Relations Board, the individual appellants committed perjury, falsified exhibits, and offered a potential witness against them a bribe not to testify. As a result they were convicted of a federal crime, and were fined and placed on probation. Appellants allege that they engaged in this criminal conduct on the advice and with the assistance of appellees, and they seek compensatory and punitive damages for professional malpractice (Count I), the infliction of emotional distress (Count II), and deceit (Count III), and compensatory damages for breach of contract (Count IV). The lower court held that appellants are entitled to no relief because they and appellees are *in pari delicto*. We agree with the lower court that appellants are entitled to no relief, except we think that if they can prove their allegations, they are entitled to recover the legal fees they paid appellees. We shall therefore modify the order of the lower court to provide that appellants'

complaint is dismissed, except as to so much of Count IV as seeks to recover legal fees paid appellees. As so modified, the order will be affirmed.

1

■ Since the case arises on appellees' demurrer to appellants' complaint, we shall assume that the facts pleaded in the complaint are true. *Sinn v. Burd*, 486 Pa. 146, 404 A.2d 672 (1979); *Gekas v. Shapp*, 469 Pa. 1, 364 A.2d 691 (1976); *DeSantis v. Swigart*, 296 Pa.Super. 283, 442 A.2d 770 (1982).[1] The complaint is detailed and diffuse, comprising one hundred and forty six paragraphs. R.R. 6a–55a. Its dispositive allegations may be summarized as follows.

Appellants are engaged in the retail men's clothing business. One of appellants is a corporation, trading as "Today's Man;" the other appellants are individuals who are officers or employees of the corporation. Appellees are a law firm, Pechner, Dorfman, Wolffe, Rounick & Cabot, and partners and associates of the firm. In June 1977 the corporation retained the Pechner firm as special labor counsel. The corporation wanted to prevent the Philadelphia Joint Board, Amalgamated Clothing and Textile Workers' Union, AFL–CIO, from organizing its warehouse employees. As the corporation's labor counsel, members of the labor section of the Pechner firm devised a plan to prevent unionization of the warehouse employees. Generally stat-

1. Appellants have made various factual statements in their brief that go beyond the allegations of their complaint. *See, e.g.,* Brief for Appellants at 12, 13, 14, 39, 42–43, *and see* Brief for Appellees at 11–12. This is improper, *DeSantis v. Swigart, supra* ("In ruling on a demurrer, the court may consider only such matters as arise out of the complaint itself; it cannot supply a fact missing in the complaint."); *Coccia v. Coccia*, 285 Pa.Super. 259, 427 A.2d 212 (1981) (*ibid.*); *Duffee v. Judson*, 251 Pa.Super. 406, 380 A.2d 843 (1977) (*ibid.*), and we have ignored the statements. Appellees filed with the lower court, and have filed with us, *see* Supplemental Reproduced Record, portions of the criminal proceedings against appellants in the United States District Court for the Eastern District of Pennsylvania. The lower court took judicial notice of "such matters as the pleas of guilty to certain counts of the indictment and the judgment of conviction of the court." Slip op. at 6 n. 4. We do not take judicial notice of such matters, for it is unnecessary, as the lower court also observed, *id.,* to look beyond the allegations of the complaint.

ed, the plan was to ensure that a majority of the warehouse employees would vote against being represented by the union. To accomplish this, several warehouse employees suspected of being sympathetic to the union were fired, and certain management personnel, specifically, Larry Feld and appellants Klein and Jacobson, each a vice-president of the corporation, were falsely designated as warehouse employees.

In the ensuing dispute, the union filed a representation petition with the National Labor Relations Board, seeking an order fixing the membership of the warehouse employee bargaining unit. At the hearings on the petition, appellants lied under oath and submitted falsified time cards and payroll records in an effort to convince the hearing officer that the designated warehouse employees were in fact warehouse employees who should be permitted to participate in the union representation election. Appellants engaged in this criminal conduct on the advice and with the assistance of the Pechner firm labor lawyers.

The union also filed an unfair labor practice complaint with the National Labor Relations Board. A warehouse employee, one Tyrone Evans, was subpoenaed to testify at the hearing on the complaint. Evans knew that appellants had lied under oath and had submitted false documents at the hearing on the representation petition. In an attempt to keep him from testifying, several of the Pechner firm labor lawyers and Feld offered Evans a bribe to ignore the subpoena for his appearance.

As a result of their conduct at the representation hearing, the individual appellants were indicted for perjury and interference with an agent of the National Labor Relations Board. Each was convicted of a federal crime, and was fined and placed on probation.

Appellants allege that as a result of the Pechner firm's representation of them, they suffered various damages, including loss of business, emotional distress, and unnecessary legal expenses. Count I of the complaint seeks compensatory damages "in an amount exceeding $250,000" and

punitive damages for professional malpractice; Count II seeks the same damages for the infliction of emotional distress, and Count III, for deceit. Count IV seeks compensatory damages for breach of contract, "in an amount equal to the monies already paid" the Pechner firm, and "in an amount equal to the monies necessarily expended by [appellants] to correct the effects" of the Pechner firm's breach of contract to provide appellants "competent, professional advice of the quality reasonably to be expected from labor counsel." Complaint, paras. 145(b), 141.

## 2

The common law doctrine of *in pari delicto* ("in equal fault") is an application of the principle that " 'no court will lend its aid to a man who grounds his action upon an immoral or illegal act.' " *Fowler v. Scully*, 72 Pa. 456, 467 (1872) (collecting authorities, and quoting YEATES, J., in *Mitchell v. Smith*, 1 Binn. 110, 121 (1804), who was in turn quoting Lord Mansfield in *Holman v. Johnson*, 98 Eng. Rep. 1120 (1775)).[2] When the doctrine is applied, the result is to render the transaction between the parties "absolutely without any force or effect whatever .... The law will leave the parties just in the condition in which it finds them." *Pittsburg v. Goshorn*, 230 Pa. 212, 227 (1911). *And see Kuhn v. Buhl*, 251 Pa. 348, 371, 96 A. 977 (1916); *Burkholder v. Beetem's Adm'rs*, 65 Pa. 496, 505–506 (1870).

**2.** The doctrine of *in pari delicto* was first applied by Lord Mansfield in *Smith v. Bromley*, 2 Doug. 606n., 99 Eng.Rep. 441n. (N.P.1760). *See generally* Wade, Restitution of Benefits Acquired Through Illegal Transactions," 95 U.Pa.L.Rev. 261 (1947); Grodecki, "In Pari Delicto Potior Est Conditio Defendentis," 71 L.Q.Rev. 254 (1955). It has been argued that the doctrine has such diverse purposes as preserving the dignity of the courts, expressing a moral principle, and enforcing public policy. *See* Grodecki, *supra* at 265–273. Statements comparable to Lord Mansfield's may be found in *Bank of the United States v. Owen*, 2 Peter (27 U.S.) 527, 538, 7 L.Ed. 508 (1829) ("No court of justice can in its nature be made the handmaid of iniquity ..." or "become auxiliary to the consummation of violations of law."); *Seagirt Realty Corp. v. Chazanof*, 13 N.Y.2d 282, 287, 246 N.Y.S.2d 613, 617, 196 N.E.2d 254, 257 (1963) (dissent) ("No right of action can spring from an illegal contract and ... courts do not sit to give protection to cheaters or to act 'as paymaster of the wages of crime.' "

The doctrine is subject to qualifications, however, which have been variously stated. In Story Equity Jurisprudence § 423 (14th ed. 1918) it is said:

And indeed in cases where both parties are *in delicto*, concurring in an illegal act, it does not always follow that they stand *in pari delicto;* for there may be, and often are, very different degrees in their guilt. One party may act under circumstances of oppression, imposition, hardship, undue influence, or great inequality of condition or age; so that his guilt may be far less in degree than that of his associate in the offense. And besides, there may be on the part of the court itself a necessity of supporting the public interests or public policy in many cases, however reprehensible the acts of the parties may be.

Generally stated, appellants' argument is that they are within Story's qualification, that is, that their "guilt [is] far less in degree" than appellees'. They compare themselves to "the blind owners of a ship who retained the expert services of navigators [the Pechner firm lawyers] to guide them through potentially dark and troubled waters [the dispute with the union]." Brief for Appellants at 45. "Unbeknowst" to them, they say, the lawyers were "mutinous navigators who were bent on steering [appellants'] uninsured ship into a violent storm." *Id.* "Public policy demands," they conclude, "that [the lawyers] be made to accept civil liability for their mutinous behavior." *Id.* at 46.

Appellants' self-pity is almost as reprehensible as their conduct before the National Labor Relations Board. Granted that the Pechner firm lawyers advised them to lie under oath, to prepare and to submit false documents, and to attempt to bribe a potential witness not to testify. Still, no one *made* them engage in such conduct. Appellants plead all sorts of excuses for their conduct. For example, they say—and we take it as true—that the lawyers told them that it was "legal" to fire warehouse employees sympathetic to the union, Complaint, para. 37(a); that they didn't know "until two or three days before" the first hearing on the representation petition that their testimony would be

under oath, *id.*, para. 50; that the lawyers told them "that the best way to counter the expected union lies was to present misstatements of fact" [why is the Union's evidence "lies" and appellants' "misstatement of facts?"] and "introduce falsified time cards," and that "this was the way things were always done," *id.*, para. 51(d), (f); that they acted on the lawyers' "coaching, instruction, [and] advice," *id.*, para. 68; and so on. But these allegations do not diminish in the slightest degree the deliberate wilfulness of appellants' conduct. They knew exactly *what* they wanted to do: defeat the union. When the lawyers told them *how* to do it—that they should commit perjury and falsify documents—they did it.

Given the deliberate wilfulness of appellants' conduct, we might decide this case by holding that appellants are not within Story's qualification of the doctrine of *in pari delicto:*[3] they did *not* "act under circumstances of oppression, imposition, hardship, undue influence, or great inequality of condition or age;" it therefore may *not* be said that their "guilt [is] far less in degree than that of [appellees as their] associate[s] in the offense;" they therefore *are in pari delicto* with appellees.

**3.** Story's qualification itself needs qualification, for duress may not be enough to defeat a plea of *in pari delicto.* In *Union Exchange National Bank of New York v. Joseph,* 231 N.Y. 250, 131 N.E. 905 (1921), the plaintiff sued on a promissory note that the defendant had given under duress arising from the plaintiff's threat to prosecute the defendant's bankrupt brother-in-law for criminal misappropriation of the plaintiff's funds. Cardozo, J., said: "We think the defendant, if a victim of duress, was at the same time a wrongdoer when he stifled a charge of crime." *Id.* at 252. Judge Cardozo continued: "We are urged in apportioning the blame to allot a heavier weight of guilt to the plaintiff who exacted than to the defendant who complied. The same argument was pressed in *Haynes v. Rudd* (102 N.Y. 372, 7 N.E. 287, reversing 30 Hun. 237). We found no inequality sufficient to set the law in motion at the suit of knowing wrongdoers to undo a known wrong (102 N.Y. at p. 377, 7 N.E. 287). They had chosen to put private welfare above duty to the state. The state would not concern itself with the readjustment of their burdens unless for some better reason than the fact that indifference to duty had followed hard upon temptation. Excuse would seldom fail if temptation could supply it." *Id.* 231 N.Y. at 254, 131 N.E. 905.

If we were to take this approach, however, we should have to ask one more question, in Story's words, whether "there may be on the part of the court itself a necessity of supporting the public interests or public policy ..., however reprehensible the acts of the parties may be." In other words: Even though appellants and appellees *are in pari delicto*, are there considerations of public policy that persuade us that appellants are nevertheless entitled to relief? Appellants, not expressly but by implication, argue that we should ask this further question, for, as we have mentioned, they conclude their brief with the assertion that "[p]ublic policy demands that [appellees] be made to accept civil liability" for their conduct. Brief for Appellants at 46. Appellees take the same approach, although not surprisingly, in their view public policy requires that appellants be denied relief.

Distinguished, and recent, precedent supports this traditional two-step, as it may be described, approach. In *Tarasi v. Pittsburgh National Bank*, 555 F.2d 1152 (3d Cir.) *cert. denied*, 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 451 (1977), the action was to recover under the Securities Exchange Act. The plaintiffs had received confidential information from an officer of the defendant bank concerning a prospective merger of two corporations. Without disclosing that they were acting on the basis of this information, the plaintiffs bought stock in one of the corporations. When instead of going up in value, the stock went down, the plaintiffs sued the bank officer and the bank for their loss. On the defendants' plea of *in pari delicto*, the District Court granted summary judgment in their favor. The Court of Appeals affirmed. In doing so, the court followed the traditional two-step approach. First it asked whether the parties were *in pari delicto*. Both sides had violated the Securities Exchange Act, the bank officer as a "tipper" and the plaintiffs as "tippees." While acknowledging that their respective conduct was therefore not the same, the court nevertheless concluded that the plaintiffs' fault was "substantially equal" to the defendant, and had "a suffi-

cient causal relation with their losses." 555 F.2d at 1162. In reaching this conclusion, the court emphasized—as we have, in our comments on the nature of appellants' conduct—that "the plaintiffs in this case willingly committed illegal acts...." *Id.* Accordingly, the court said, "the concept of *in pari delicto*" was "[brought] into play." Next, the court proceeded to "complete [its] inquiry" by considering whether there were considerations of public policy such that despite their equal fault, the plaintiffs should be entitled to recover their losses from the defendants. *Id.* at 1162–64. (The court found no such considerations.)

Upon reflection, we have decided not to take this two-step approach. The reason we have decided not to take it is its dependence upon the concept of "public policy." "[Public policy] is a very unruly horse, and once you get astride it you never know where it will carry you. It may lead you from the sound law. It is never argued at all but when other points fail." *Richardson v. Mellish,* 130 Eng.Rep. 294, 303 (1824), Burrough, J.[4]

In explaining our conclusion, we may start with a simple case, in which the analysis involves only one step, not two. Consider, for example, *Jenkins v. Fowler,* 24 Pa. 308 (1859). There the parties were farmers, who owned adjoining lands. To save labor and expense in planting and harvesting their crops, they agreed to enclose their fields. The fence they put up closed off not only their fields but also a public road. "When the defendant got his own crop away, he threw down that part of the fence which he had placed on the road, and thus caused the plaintiff's grain to be destroyed by the cattle which were let in upon it." *Id.* 24 Pa. at 309. In holding that the plaintiff was entitled to no relief, the Supreme Court said that the parties' agreement "was illegal and void. It was an agreement to commit a nuisance for

---

4. It is arguable that since the doctrine of *in pari delicto* is itself founded upon considerations of public policy, rather than upon logical deductions from established rules of law, the same criticism is equally applicable to it. Wade, *supra* at 297. We needn't, however, get into this argument.

which both of the parties were liable to an indictment . . . . The contract being wholly void, one of the parties cannot sue the other for the breach of it." *Id.*

In a case such as *Jenkins,* resort to the doctrine of *in pari delicto* may be helpful, for one party's fault may persuasively be characterized as "equal" to the other's: each party entered into the identical illegal agreement—to close off a public road; and each did the identical illegal act—putting up the fence.

Now consider a case in which one party's conduct is not the same as the other's. The "tipper," who leaks confidential information, does not commit the same wrong as the "tippee," who acts upon the information. When in such a case the court resorts to the doctrine of *in pari delicto*, it will be led, as the court in *Tarasi v. Pittsburgh National Bank, supra,* was led, into taking the traditional two-step approach: Since the respective parties' conduct was not the same, it cannot be simply equated. Perhaps, however, their conduct was "substantially equal." If so, are there "considerations of public policy" that should nevertheless permit the plaintiff to recover? We do not find this a useful inquiry.

Suppose, for a moment, that instead of comparing *conduct*—the plaintiff's with the defendant's—we compare something else, say, oranges with potatoes. Since the objects are not identical, we may not say that they are *"in pari;"* the one-step approach taken in *Jenkins* is not available. Let us therefore try the two-step approach taken in *Tarasi*. Taking the first step, we might decide that since both oranges and potatoes are food, they are at least in some sense "substantially equal." Taking the second step, we might then go on to ask whether there are considerations of policy such that oranges should nevertheless be favored. But how could that question be answered? From one point of view—source of Vitamin C—oranges should be favored, but from another—source of carbohydrates—potatoes should be. Thus the decision which should be favored

would depend upon which policy were chosen, and that choice would be essentially arbitrary.

It is all very well to decide that in terms of "fault" the plaintiff's conduct is "substantially equal" to the defendant's. But going on to ask whether because of "considerations of public policy" the plaintiff should nevertheless be favored—should be granted relief—is like comparing oranges and potatoes. From one point of view, the plaintiff should be favored, but from another, he shouldn't be; and choosing which point of view to adopt will often be essentially arbitrary. It is this quality of arbitrariness that justifies the characterization of public policy as "a very unruly horse," which may carry one "you never know where."

Consider the facts before us. We may not take the one-step approach of *Jenkins*, for appellants' conduct was not the same as appellees'. While appellees advised appellants to lie, it was appellants who did lie. Neither was appellants' character the same as appellees' (business men versus professionals); nor were their motives (to defeat the union versus to earn a fee). Suppose then that we take the two-step approach of *Tarasi*. Certainly appellants and appellees were both at fault, and perhaps we might persuasively say that their fault was in some sense "substantially equal." But what then? We could decide that "considerations of public policy" require that dishonest lawyers be punished, even though that means their dishonest clients recover damages in excess of $250,000. That's what appellants urge us to decide. Or we could decide that "considerations of public policy" require that adjudicatory proceedings intended to enforce national labor relations be free of perjured testimony, even though that means dishonest lawyers escape paying damages. That's what appellees urge us to decide. Just as when comparing oranges with potatoes, we could favor either appellants or appellees, depending upon which point of view—which "public policy"—we

chose. But it would be difficult to characterize our choice as other than arbitrary. In another action another court might with equal justification make another choice. *Cf. Tarasi v. Pittsburgh National Bank, supra, and Nathanson v. Weis, Voisin, Cannon, Inc.,* 325 F.Supp. 50 (S.D.N.Y.1970), *with Kuchnert v. Texstar Corp.,* 412 F.3d 700 (5th Cir.1969). *And see* the several opinions in *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134 (1968), 88 S.Ct. 1981, 20 L.Ed.2d 982.[5]

We think we will do better if we altogether avoid resort to the doctrine of *in pari delicto.* While we acknowledge the doctrine's usefulness in such uncomplicated cases as *Jenkins v. Fowler, supra,* here, in our opinion, it causes more difficulties than it resolves.[6]

■ Instead, we shall rely upon the general principle of which the doctrine of *in pari delicto* is a specific and

**5.** *See also American Society of Mechanical Engineers, Inc. v. Hydrolevel Corporation,* 456 U.S. 556, 568 n. 6, 102 S.Ct. 1935, 1945, n. 6, 72 L.Ed.2d 330, 341 n. 6 (1982) (approving the refusal of *Perma Life Mufflers, supra,* "to apply the ancient defense of *in pari delicto* in antitrust cases" inasmuch as "Victorian common law does not define the limits of the antitrust private action."); *E.F. Hutton v. Berns,* 682 F.2d 173, 176 n. 6 (8th Cir.1982) (Collecting securities law violation cases which either allow or deny the *in pari delicto* defense). For additional cases in accord with *Tarasi, see, e.g., Lawler v. Gilliam,* 569 F.2d 1283 (4th Cir.1978); *Haynes v. Anderson and Stridwick, Inc.,* 508 F.Supp. 1303 (1981); *Sostrin v. Altschul,* 492 F.Supp. 486 (N.D.Ill.E.D. 1980); *Federal Dep. Ins. Corp. v. Aroneck,* 509 F.Supp. 553 (D.So.Car. 1979).

**6.** *Cf.* Grodecki, *supra* at 265.

[T]he words *in pari delicto* do not in law mean what they appear to say and are given a technical meaning. A layman might well think that the court, after an inquiry into the respective conduct of the two parties, rewards the less guilty. In fact, it allows recovery where the plaintiff is guilty of no *delictum* at all, either because he was induced to enter into the bargain by oppression, duress or fraud of the other party or because he belonged to a class protected by a statute or, finally, because he was ignorant of a fact which rendered the contract illegal. The courts wisely refrain from weighing the respective merits and demerits of the parties and from making their decision depend upon the result. The analysis involved would be far too subtle, the result often far too arbitrary.

limited application. That principle, as already remarked, is that "no court will lend its aid to a man who grounds his action upon an immoral or illegal act." *Fowler v. Scully, supra* at 467. While we find no persuasive answer to the question whether appellants' conduct was more, or less, or equally, "immoral or illegal" than was appellees', that it *was* immoral or illegal is clear; and that appellants' action is grounded upon their immoral or illegal conduct is also clear. We find this a sufficient basis for decision.[7]

■ The reason no court will lend its aid to an action grounded upon immoral or illegal conduct is that "the law will not suffer itself to be prostituted." *Fowler v. Scully, supra* at 468. Were we to aid appellants—confessed perjurers—in their attempt to recover compensatory and punitive damages in excess of $250,000, we should indeed "suffer [the law] to be prostituted." For we should reward appellants, with a great deal of money, for their criminal conduct; we should soften the blow of the fines and sentences imposed upon them; and we should encourage others to believe that if they committed crimes on their lawyers' advice, and were caught, they too might sue their lawyers and be similarly rewarded.

### 3

We recognize, however, that the principle that "no court will lend its aid to a man who grounds his action upon an immoral or illegal act" is not some sort of magic wand

---

7. For other cases in which the court has relied, directly or indirectly, on Lord Mansfield's principle, without taking the two-step approach taken in *Tarasi, see Davis v. Pennzoil Company,* 438 Pa. 194, 209, 264 A.2d 597 (1970); *Dippel v. Brunozzi,* 365 Pa. 264, 267, 74 A.2d 112, 114 (1950); *Halkias v. Liberty Laundry Co.,* 361 Pa. 475, 479, 64 A.2d 800, 802 (1949); *Tucker v. Binenstock,* 310 Pa. 254, 259, 165 A. 247, 248 (1933); *Ad-Lee Co. v. Meyer,* 294 Pa. 498, 502, 144 A. 540, 541–542 (1928) (*quoting Holman v. Johnson* and collecting Pennsylvania cases); *Kuhn v. Buhl,* 251 Pa. 348, 371, 96 A. 977, 984 (1916); *Pittsburg v. Goshorn,* 230 Pa. 212, 227, 79 A. 505, 510 (1911). *Gramby v. Cobb,* 282 Pa.Super. 183, 189, 422 A.2d 889, 892 (1980); *Shafer v. A.I.I.S., Inc.,* 285 Pa.Super. 490, 494, 428 A.2d 152 (1981).

before which the most complex case dissolves into simple solution. The circumstances may be so tangled that by deciding not to lend its aid to one party, the court will aid the other. In such a case, how should the court proceed? This very question arises here,[8] for one of appellants' demands is to recover the legal fees they paid appellees, Complaint, para. 145, and if, in refusing to aid appellants, we preclude them from recovering these fees, we shall to that extent aid appellees. We must therefore ask whether we wish to do that.[9]

In considering whether we should aid appellees by enabling them to keep the legal fees appellants paid them, we have found the opinion of Chief Justice Rugg in *Berman v. Coakley*, 243 Mass. 348, 137 N.E. 667 (1923), especially helpful. There the plaintiff was the proprietor of a hotel in Boston and the defendant was a lawyer. The case arose on demurrer, so the allegations of the plaintiff's bill in equity were admitted as true. These allegations were as follows. The defendant and one Corcoran formed a conspiracy to cheat the plaintiff. The defendant falsely told the plaintiff that Corcoran was going to complain to the district attorney that the plaintiff had permitted Corcoran's wife to use his hotel for purposes of unlawful sexual intercourse. The plaintiff thereupon retained the defendant as his lawyer,

8. Had we relied upon, instead of deciding to avoid, the doctrine of *in pari delicto*, this question might not arise. The full maxim, *in pari delicto potior est conditio defendentis*, means that where the plaintiff and the defendant are in equal fault, the defendant's position is stronger. And the reason it is stronger, it has been said, is because the law requires those who seek relief to "draw their justice from pure fountains." *Austin's Adm'x v. Winston's Ex'x*, 11 Va. 32, 48 (1806).

9. It might be suggested that appellees, unlike appellants, have not brought any "action," so that it may not be said that they "ground[ ] [an] action upon an immoral or illegal act." But appellees *have* filed preliminary objections, asking that appellants' complaint be dismissed. They therefore *do* seek the court's aid. It is of no importance that they seek it, not to *make* a recovery, as appellants do, but to *defeat* a recovery. The applicability of the principle that the court will not aid an action grounded upon an immoral or illegal act should not turn upon whether the aid is sought by complaint or by preliminary objections.

and the defendant, pretending to act as the plaintiff's lawyer, told the plaintiff that Corcoran would withdraw his complaint if he were paid $35,000. The defendant advised the plaintiff to comply with this demand, and the plaintiff paid the money. The action was to recover the money. The defendant demurred on the ground that the money was paid pursuant to an illegal contract. The trial judge reversed the point, and the Supreme Judicial Court overruled the demurrer.

The Chief Justice opened his discussion with the statement that the contract between the parties was indeed illegal:

> It is a doctrine so well settled as not to be open to discussion that courts will not aid in the enforcement, nor afford relief against the evil conŝequences, of an illegal or immoral contract. One branch of that general princi- ple is that a private agreement made in consideration of the suppression of a criminal prosecution will neither be enforced nor abrogated by a court of equity. That doctrine is founded upon the public policy that the course of justice cannot be defeated for the benefit of an individual.

> *Id.* at 350, 137 N.E. at 668–669 (citations omitted).

Nevertheless, the court held that the plaintiff should be permitted to maintain his action. After examining a good many cases, the Chief Justice stated:

> An attorney at law has been said to be a public officer. He is an officer of the court sworn to aid in the administration of justice and to act with all good fidelity both to his clients and to the court. The public have a deep and vital interest in his integrity. [citations omitted] It is a matter of profound importance from every point of view that members of the bar be men of probity and rectitude, zealous to maintain relations of utmost honesty with their clients and solicitous to protect them against legal wrong. Unflinching fidelity to their genuine interests is the duty of every attorney to his clients. Public policy can hardly

touch matters of more general concern than the maintenance of an untarnished standard of conduct by the attorney at law toward his client. The attorney and client do not deal with each other at arms' length. The client often is in many respects powerless to resist the influence of his attorney. If that influence be vicious, untoward, criminal, the relation of trust is abused and becomes a source of wrong.

*Id.* at 354–55, 137 N.E. at 670–671.

The Chief Justice went on to say that on the facts before the court, "The plaintiff and the defendants were not *in pari delicto*. Whatever may be justly said in condemnation of the acts of the plaintiff is less than is necessary touching the acts of the defendant." *Id.*

■ Of course, *Berman* may be read as holding no more than that where the parties are not *in pari delicto*—because the client "is in many respects powerless to resist the influence of his attorney"—recovery will be allowed. We acknowledge that the Chief Justice's discussion adopts the traditional two-step approach of first considering whether the parties' fault is equal. Indeed, he quotes Story's formulation, which we have quoted in beginning our discussion. We think, however, that this would be too narrow a reading of *Berman*, and that the more accurate reading is that it stands for the proposition that even when the client has acted immorally or illegally, the lawyer may not keep money gotten from the client in violation of the lawyer's professional obligations. We find this proposition implicit in the Chief Justice's emphasis on "the maintenance of an untarnished standard of conduct by the attorney at law toward his client."[10]

10. *And see Ford v. Harrington,* 16 N.Y. 285, 293–294 (1857) ("It would be a reproach to our judicial tribunals should they allow their officers [ ] to acquire property by a prostitution of the trust [ ] confided to them, and then to interpose the fraud committed pursuant to their advice as such officers, as a shield to protect them in the possession and enjoyment of that property."). *See also Schermerhorn v. De Chambrun,* 64 F. 195 (2nd Cir.1894).

Our reading of *Berman* is supported by the decision of our Supreme Court in *Peyton v. Margiotti*, 398 Pa. 86, 156 A.2d 865 (1959), which quoted extensively from *Berman.* In *Peyton* the defendant lawyer accepted $5,000 from the plaintiff on the understanding that he would return the money if he did not succeed in having the plaintiff's brother released from prison by Christmas. The lawyer persuaded the Pardon Board that the brother should be released, but the Governor withheld his signature, and the brother was not released from prison until well after Christmas. On the plaintiff's action to recover the $5,000 from the lawyer's estate, the estate pleaded that as a contingent fee agreement in a criminal case, the lawyer's promise to return the money was a contract against public policy, and therefore unenforcible. The Supreme Court agreed that the contract was against public policy. Collecting cases, the Court compared the contract to such contracts as a contract to procure a pardon from the Governor, a contract to procure the passage of an Act of the Legislature by using personal influence with the members, and a contract to have a man discharged from the draft. "But," the Court said, "the law would fall short if it only left the parties where it found them." *Id.*, 398 Pa. at 92, 156 A.2d at 868. Quoting *Berman*, the Court concluded "that despite the essential invalidity of the contingent fee agreement the law should be allowed to favor the plaintiffs because of the circumstances." *Id.*, 398 Pa. at 93, 156 A.2d at 868–869. The Court thus read *Berman* as we do. For the lawyer in *Peyton* was not guilty of any fraud or extortion. Indeed, he "achiev[ed] rather spectacular results" for his client. *Id.*, 398 Pa. at 94, 156 A.2d at 369. On a traditional *in pari delicto* analysis, it would seem that the client's fault in seeking the lawyer's services might easily be found equal to the lawyer's fault. And yet the Court held that the lawyer's estate had to return the fee.

■ We therefore hold that when a lawyer has by immoral or illegal conduct violated his professional obligations to

his client, an action by the client to recover the lawyer's fee will not be barred on the lawyer's plea that the client also engaged in immoral or illegal conduct. The conclusion follows that if appellants can prove the allegations of their complaint, they may recover the fees they paid appellees.

██ We are aware that this conclusion opens us to a charge of inconsistency: while saying that we will not aid appellants, we yet permit them to recover the fees they paid appellees. We believe, however, that we have been as consistent as possible. On the allegations of the complaint, both appellants and appellees have acted immorally and illegally. We wish to aid *none* of them, and we have come as close as we can to achieving that result.[11] While appellants will have been aided if they recover the fees they paid appellees, this aid will be very limited. For appellants may recover only the fees they paid; no lost profits or any other sort of damages—whether for legal malpractice, infliction of emotional distress, deceit, or anything else—may be recovered.

The order of the lower court is modified to provide that appellants' complaint is dismissed, except as to so much of Count IV as seeks to recover legal fees paid appellees. As so modified, the order is affirmed.

11. Others have struggled with the problem of restitution in illegal contract cases. *See generally* Wade, *supra* at 301–305. Wigmore would allow "the plaintiff to recover the full amount of the enrichment but to deduct from that amount a sum to be set by the court and hold this sum for some other purpose." *Id.* at 304, citing Wigmore, "A summary of Quasi-Contracts," 25 Am.L.Rev. 695, 712, n. (k) (1891). St. Thomas Aquinas had a similar solution. He argued that "the giver deserves to lose what he gave, wherefore restitution should not be made to him; and, since the receiver acted against the law in receiving, he must not retain the price but must use it for some pious object." Summa Theologica, II–II Q. 62, Art. 5, quoted in Grodecki, *supra* at 267. However desirable these proposals may be, we are not in a position to implement them.