[Cite as *Downie-Gombach v. Laurie*, 2015-Ohio-3584.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 102167**

# CATHERINE DOWNIE-GOMBACH

PLAINTIFF-APPELLANT

vs.

# CAROLE E. LAURIE, ADMINISTRATOR OF THE ESTATE OF CHARLES R. LAURIE, DECEASED

DEFENDANT-APPELLEE

### JUDGMENT:
REVERSED AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-12-790224

**BEFORE:** Laster Mays, J., Jones, P.J., and Keough, J.

**RELEASED AND JOURNALIZED:** September 3, 2015

**ATTORNEY FOR APPELLANT**

Frank S. Carlson
McGlamery & Loughman Co., L.P.A.
5455 Detroit Road
Sheffield Village, Ohio 44054

**ATTORNEYS FOR APPELLEE**

Holly Olarczuk-Smith
Monica A. Sansalone
Gallagher & Sharp
Bulkley Building, Seventh Floor
1501 Euclid Avenue
Cleveland, Ohio 44115

Timothy A. Boyko
Boyko, Dobeck, & Weaver
7393 Broadview Road, Suite A
Seven Hills, Ohio 44131

**ATTORNEY FOR PROFESSIONAL SOLUTIONS INSURANCE CO.**

Victoria L. Vance
Tucker Ellis
950 Main Avenue, Suite 1100
Cleveland, Ohio 44113

ANITA LASTER MAYS, J.:

I. **Facts and Procedure**

{¶1} Plaintiff-appellant Catherine Downie-Gombach ("Gombach") appeals the decision, following a bench trial, of the Cuyahoga County Court of Common Pleas denying her complaint for legal malpractice and breach of fiduciary duty against her former attorney, defendant-appellee Charles R. Laurie ("Laurie"),[1] finding that the parties were in pari delicto in attempting to defraud creditors by depositing Gombach's life insurance funds into Laurie's Interest on Lawyers' Trust Account ("IOLTA") account at his direction. After a review of the record, we reverse and remand.

{¶2} Gombach[2] served as a nun for 32 years, left the order and worked as a teacher and pastor associate for 10 years, and lived independently until she married Anton Downie-Gombach in 1996 ("Anton"). Anton was the sole owner of Champion Welding Products and Gombach was not involved with the company. They jointly purchased several investment properties, some with her lump sum retirement proceeds and the

---

[1] Laurie died on February 7, 2015, and the estate has been substituted as defendant-appellee in this case.

[2] Gombach is currently approximately 79 years of age.

revenue from the sale of her premarital home, and built a residence. Anton paid the bills and managed the finances.

{¶3} On March 3, 2006, Anton died from a massive cerebral hemorrhage. During the months prior to his death, Gombach noticed certified mail notices were being delivered to their home and credit card purchase attempts began to be declined. Gombach had also learned that Anton was trying to sell his business though he did not discuss it with her.

{¶4} By the time of Anton's death, creditors were actively pursuing the company, Anton, and Gombach. After Anton's death, American General Life Insurance notified Gombach that she was the beneficiary of Anton's life insurance proceeds totaling $504,889.29.[3] Gombach recalled that Anton mentioned she would be a "rich widow" if he died, but she otherwise was not aware of the insurance. The insurance checks were issued on April 21, 2006 and May 5, 2006. Gombach was concerned about depositing them into her checking account because of the creditor issues.

{¶5} Gombach was introduced to Laurie at a meeting with the attorneys who represented her husband's estate and the attorney representing the company on June 12, 2006. Gombach was informed at the meeting that she would have to retain her own attorney because of a potential conflict of interest. Laurie was present at the meeting but

---

[3] The company issued two checks to Gombach in the amounts of $251,924.22 and $252,965.07.

was not a participant. The attorneys introduced Gombach to Laurie and they scheduled an appointment.

{¶6} Gombach and her sister's husband, Thomas Hesmond ("Hesmond"), met with Laurie on June 15, 2006. They discussed the pending legal matters. Gombach asked Laurie whether it was possible to protect the insurance proceeds in light of the financial issues. Laurie advised Gombach to deposit the checks into his IOLTA account and refer all creditors to him. He assured her that other clients deposited their funds in his IOLTA account.

{¶7} A letter of representation was executed by the parties and the life insurance proceeds were deposited into Laurie's IOLTA account on June 16, 2006. Laurie was to handle all matters relating to the estate including all creditor matters.

{¶8} Foreclosure actions were filed against Gombach's home and rental properties, automobiles were repossessed and judgments perfected. Gombach lost everything and ultimately attempted to live on proceeds from her husband's social security.

{¶9} Creditors were referred to Laurie who initially provided detailed statements documenting the fees and expenses that were deducted directly from the account by Laurie. The legal services listed included Laurie's dealings with creditors and related expenses. At least one creditor, FirstMerit, was paid in full from the proceeds.

{¶10} After approximately a year the statements ceased. The last accounting documented from the IOLTA account was dated December 12, 2008 for the amount of

$485,236.47. Ten checks were issued by Laurie to Gombach's brothers-in-law, at her request, for living expenses during 2010 and 2011, totaling $58,000.

{¶11} Gombach attempted to contact Laurie in 2012 but the business phone was disconnected. She called Laurie's home and he told her the money was gone, which was confirmed by his attorney. Gombach was not aware that, in the past few years, Laurie had been diagnosed with dementia, relinquished his law license and placed under legal guardianship for incompetence.

{¶12} Gombach filed suit against Laurie. The complaint advanced several causes of action but ultimately moved forward based on legal malpractice due to the alleged misappropriated funds and breach of fiduciary duty. Laurie's malpractice insurance carrier, American General Insurance, was a limited intervenor in the suit.

A. Discovery

{¶13} Gombach and her brothers-in-law were deposed and the transcripts were filed with the court. Gombach's testimony at the deposition echoed her testimony at trial, the details of which are addressed herein below as Gombach was the sole trial witness. The depositions of the brothers-in-law, Frank Leon ("Leon") and Hesmond, focused on the IOLTA checks issued to them by Laurie.

{¶14} Leon explained that he knew that his sister-in-law had lost everything, including having her car repossessed, because she was living with him and his wife, Gombach's sister. He cashed the checks and gave the proceeds to Gombach, assuming that, due to her financial problems, she was unable to cash them and saw no problem with

the checks since they were issued by her lawyer. Leon had no dealings with Laurie and there was never any discussion with Gombach about hiding assets. Leon also gave money to Gombach from time to time and said that Gombach was very unsophisticated and inexperienced regarding finances.

{¶15} Hesmond testified that he attended two of Gombach's meetings with Laurie. Hesmond was present at the meeting where they discussed the "long list of issues" Gombach was facing. He stated Laurie advised Gombach that she could deposit the insurance proceed in his IOLTA account, and Laurie assured Gombach that he held money in the account for other clients. Hesmond said his understanding was that Laurie was handling everything that needed to be handled.

{¶16} Hesmond had no recollection of any discussion at any time about defrauding creditors. He was present at the meeting with Laurie and Gombach during the discussion about the affidavit of finances. Hesmond did not recall any mention of Sky Bank during the meeting, but recognized the affidavit form when it was presented to him at the deposition.

{¶17} Hesmond confirmed that he cashed several checks for Gombach. He saw no problem with cashing them and assumed that, due to her financial concerns, she was unable to cash them or did not have a bank account.

{¶18} Hesmond said that he never warned Gombach that putting the money in the account would be fraud against her creditors because, "[Laurie] is an attorney, why would I be concerned? * * * Why would I not trust him?" When asked whether he began to

lose trust in Laurie down the road, Hesmond responded, "[y]eah, when [Gombach] called me up and said the money's gone."

**{¶19}** Laurie was not competent to participate in the lawsuit in any respect. According to the time line Gombach prepared for her attorney during the pendency of the case, and introduced as an exhibit at trial, Laurie's attorney informed Gombach's counsel that Laurie had little recollection of the representation and could not recall any specifics regarding the IOLTA account.

**{¶20}** The case was temporarily stayed in 2012 due to Laurie's bankruptcy filing though Gombach was not a listed creditor. On December 21, 2013, Laurie's motion for summary judgment was denied by the trial court due to the existence of genuine issues of material fact.

**B.     Trial**

**{¶21}**     The parties submitted joint stipulated facts for the bench trial and subsequently, a joint list of admitted exhibits. The stipulated facts listed the amount of $485,236.47 as the IOLTA fund balance on December 12, 2008. The parties also stipulated that, of the $504,889.29 initially deposited, (1) Laurie depleted all of Gombach's funds, (2) withdrawals totaling $94,993.18 were authorized by Gombach for legal fees and services as well as for Gombach's personal use, and (3) the propriety of $68,700 in expenditures was disputed. The remaining approximately $341,196.11 was unaccounted for.

**{¶22}**  Gombach was the sole trial witness.  She stressed during the trial that she acted on the advice of counsel and was not aware that the actions were improper. Laurie's position was that Gombach conceived a scam to defraud creditors and conspired with Laurie to hide assets.

**{¶23}** Gombach testified that she was introduced to Laurie at a meeting by the attorneys for the estate and the company who had just informed her that she would have to retain her own counsel due to a potential conflict.  A few days later, Gombach and Laurie met and discussed the estate and pending financial issues.

**{¶24}**  Gombach told Laurie that she had the insurance checks and asked him whether there was a way to "protect" the insurance proceeds from creditors. Laurie advised her that she could deposit the funds with him and direct all creditors to him. Laurie and Gombach executed a retention agreement and Laurie issued a receipt for the deposited funds.

**{¶25}** Gombach testified that Laurie was protecting the funds and using them to pay the creditors that had to be paid.  One creditor, at least, was paid in full.  Gombach did not know whether others were paid in light of Laurie's dementia and lack of records.

**{¶26}**  Gombach maintained that, (1) she was trying to "protect" the funds;  (2) she had previously never heard of an IOLTA account; (3) she relied on Laurie's professional advice in choosing to deposit the checks with Laurie; and (4) there was no unlawful act or collusion.  In addition to dealing with the creditors, Laurie represented to

Gombach that after seven years, she would be entitled to the remaining proceeds free of creditor claims.

**{¶27}** Gombach stated throughout the proceedings that Laurie "was protecting the monies and using it to pay the creditors that had to be paid." Gombach referred all creditor contacts to Laurie. She knew that FirstMerit Bank had been paid which, she believed, was for the car leased by her husband's business.

**{¶28}** On December 4, 2008, Gombach sent Laurie a letter telling him that, as of March 2009, three years will have passed since her husband's death and she needed funds to live on. She also asked for the account balance because she was no longer receiving statements from him. Laurie responded in a letter dated December 12, 2008, advising that the account balance was $485,236.47.

**{¶29}** Gombach's car was repossessed and she continued to live with her sister and brother-in-law. Beginning about 2010, Gombach periodically asked Laurie to write checks to her brothers-in-law so she could have cash to live on and a car to drive.

**{¶30}** Gombach testified that Laurie's wife's business involved getting his clients to take cruises. An IOLTA account check issued in the amount of $1,432.84 was for a cruise that Gombach took with Laurie and his wife. Gombach stated she did not receive any of the checks from the IOLTA account that were payable to cash and that the only cash she received was from the checks issued to her brothers-in-law.

**{¶31}** Gombach acknowledged selling a boat for $8,000 in cash because she was concerned that any money placed in the bank might be confiscated like the family

properties had been.   She was not sure that a check would be accepted by the bank if it was payable to her.

{¶32}   Gombach testified that a debt owed to Sky Bank was a debt of the business.   She was aware that Sky Bank maintained that she signed a guaranty of payment on the debt but explained that sometimes Anton signed her name to documents. She did not recall signing it.[4]   Gombach met with Laurie about the general purpose of the affidavit.   She understood the purpose was to state her financial position as a whole and not specifically regarding Sky Bank.   Laurie prepared the answers, Gombach made a few notations, signed it, and had it notarized in September 2006.

{¶33} Laurie's counsel stated Sky Bank received judgments against Gombach and her husband, jointly and severally for $255,000 and $300,000, on the day that Gombach's husband died.   Gombach responded that she did not know there was a judgment on that date, that she had been giving all creditor information to Laurie, and he was dealing with "those issues."

{¶34}   Laurie's counsel inquired about specific affidavit responses. Question 2 of the affidavit asked whether Gombach had a savings account, certificate of deposit, or time deposit and for a list of those institutions.   Laurie listed Gombach's two bank accounts. Laurie's IOLTA account was not listed in response to question 6 regarding accounts held by Gombach.   Question 6 of the affidavit stated, "I have no account with any financial

---

[4]    References to discussions with handwriting experts are reflected in Laurie's September and October 2006 invoices.

institution" except the ones listed. Laurie inserted "aforementioned checking and savings." Laurie's IOLTA account was not listed as an account held by Gombach.

{¶35} Question 25 of the affidavit incorporated questions 22 through 24 and asked whether Gombach owns an insurance policy, is receiving dividends from an insurance company, pays premiums on an insurance policy, and whether Gombach is the beneficiary of any insurance policy. The answers inserted by Laurie were "N/A" except to question 25 that stated "[n]ot to my knowledge." The IOLTA account was not listed in response to these questions.

{¶36} In response to Laurie's counsel's statement that the deposit of the funds was a calculated plot by Gombach from the beginning and Laurie just helped to execute it, Gombach said she counted on the, "expertise that a lawyer would have in giving me advice of the safety of putting the money there." Defense counsel also asked Gombach whether she thought she was engaging in fraudulent behavior. Gombach replied that she did not "thoroughly look into" it but, as she looks back maybe she was.

{¶37} Gombach never told Laurie not to disclose information about the insurance funds and Laurie told Gombach that after seven years, the creditors could not access the insurance proceeds.

{¶38} Addressing Laurie's counsel's statements about fraudulent conveyances, Gombach's attorney asked whether Gombach knew what "the hallmarks" of a fraudulent conveyance were. She stated she did not.

**{¶39}** In response to the court's questioning, Gombach said she asked Laurie for monthly payments for living expenses in the amount of $500 or $800 but never received a response. She eventually requested that checks be issued to her brothers-in-law.

**{¶40}** The trial court ordered that final arguments be submitted in writing. On October 9, 2014, the trial court issued its journal entry. The court combined the breach of fiduciary duty and legal malpractice claims as both, arising from the legal representation, are effectively malpractice claims.

**{¶41}** The court recited the three pronged test for establishing legal malpractice: (1) an attorney-client relationship giving rise to a duty; (2) a breach of that duty; and (3) damages proximately caused by the breach. The trial court then found that Gombach was in pari delicto (at equal fault) with Laurie in the attempt to hide money from creditors, and held that "no court will lend its aid to a man who founds his cause of action upon an immoral or illegal act." *Murphy v. Kuhn*, 5th Dist. Stark No. 96 CA 0263, 1997 Ohio App. LEXIS 5900, *11 (Dec. 8, 1997), citing *Evans v. Cameron*, 121 Wis.2d 421, 427, 360 N.W.2d 25 (1985).

## II.     Assignments of Error

**{¶42}** Gombach offers the following assignments of error:

> I.     The trial court erred as a matter of law in determining that plaintiff was precluded from invoking the jurisdiction of the court in a claim against her attorney for misappropriating funds entrusted to the attorney upon his advice.

> II.     The determination of the trial court that plaintiff's conduct was in pari delicto with that of defendant was against the manifest weight of the evidence.

III.     The trial court's determination that plaintiff's conduct was in pari delicto with that of defendant was an abuse of discretion.

## III.     Standard of Review

**{¶43}**   The application of equitable doctrines is at the discretion of the trial court. *See Graham v. Szuch*, 8th Dist. Cuyahoga No. 100228,  2014-Ohio-1727, ¶ 32, citing *Nowinski v. Nowinski*, 5th Dist. Licking No. 10 CA 115, 2011-Ohio-3561, ¶ 24.   The decision of a trial court concerning the application of equitable doctrines such as unclean hands and in pari delicto will not be reversed on appeal in the absence of an abuse of discretion.   *Payne v. Cartee*, 111 Ohio App.3d 580, 590, 676 N.E.2d 946 (4th Dist.1996).

An abuse of discretion standard "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

## IV.     Analysis

**{¶44}**   We combine the  interrelated assignments of error for ease and economy of response.   We find that the trial court abused its discretion and erred as a matter of law in finding that Gombach's conduct was in pari delicto with that of Laurie.   Therefore, the judgment of the trial court is reversed and the case is remanded to the trial court to proceed in accordance with our findings.

**A.     The Doctrines of Unclean Hands and In Pari Delicto**

**{¶45}**    Laurie's affirmative defense to the legal malpractice claim was that Gombach had unclean hands.  The trial court's determination, however, was that the doctrine of in pari delicto applied.

### 1.     Unclean Hands

**{¶46}**   The unclean hands doctrine is a defense against claims in equity. *Rivers v. Otis Elevator*, 2013-Ohio-3917, 996 N.E.2d 1039, ¶ 35 (8th Dist.).   It requires a showing that the party seeking relief engaged in reprehensible conduct with respect to the subject matter of the action.  *State ex rel. Coughlin v. Summit Cty. Bd. of Elections*, 136 Ohio St.3d 371, 2013-Ohio-3867, 995 N.E.2d 1194, ¶ 16.

**{¶47}**   The doctrine of unclean hands considers whether the party seeking relief has engaged in inequitable conduct that has harmed the party against whom he seeks relief.   The doctrine of unclean hands "precludes one who has defrauded his adversary in the subject matter of the action from equitable relief." *In re Dow*, 132 B.R. 853, 860 (Bankr.S.D.Ohio 1991) (the doctrine of unclean hands does not apply where there is no allegation that the plaintiffs defrauded the defendant).

## 2. In Pari Delicto

**{¶48}** The doctrine of in pari delicto "refers to the plaintiff's participation in the same wrongdoing as the defendant." The doctrine refers to equal fault, or equal culpability. It is premised on the policy that "no Court will lend its aid to a man who founds his cause of action upon an immoral or illegal act." *Id*.

**{¶49}** The "doctrine is only applicable when the plaintiff bears equal fault to, or more fault than, the defendant for the alleged wrong." *Antioch Litigation Trust v. McDermott Will & Emery LLP*, 738 F.Supp.2d 758, 772 (S.D.Ohio 2010), citations omitted. In pari delicto is founded upon public policy, and does not depend upon the guilt or innocence of a party. *Natl. Bank v. Wheelock*, 52 Ohio St. 534, 548, 40 N.E. 636 (1895).

**{¶50}** *In re Dow, supra,* arises from a Chapter 7 bankruptcy proceeding. The trustee alleged that the attorney defendants were guilty of fraudulent or negligent misrepresentation and/or breach of contract, by causing the debtor to engage in improper real property transactions and submit inaccurate and incomplete bankruptcy petition schedules. The court treated these allegations as a claim for legal malpractice.

**{¶51}** The defendants argued that the plaintiff was aware of the inaccuracies and the claim was barred by the doctrines of in pari delicto and unclean hands because the parties were equally at fault. Defendants further contended the trustee could not succeed to greater rights than those possessed by the debtor so the trustee was also barred by the doctrines.

**{¶52}**  The *Dow* court recognized that the doctrine of pari delicto is subject to qualifications:

> And indeed in cases where both parties are in delicto, concurring in an illegal act, it does not always follow that they stand in pari delicto; for there may be, and often are, very different degrees in their guilt.  One party may act under circumstances of oppression, imposition, hardship, undue influence, or great inequality of condition or age; so that his guilt may be far less in degree than that of his associate in the offense.  And besides, there may be on the part of the court itself a necessity of supporting the public interests or public policy in many cases, however reprehensible the acts of the parties may be.  *Feld & Sons, Inc. v. Pechner, Dorfman, Wolfee, Rounick & Cabot*, 312 Pa.Super. 125, 131, 458 A.2d 545 (1983) quoting Story Equity Jurisprudence § 423 (14th ed. 1918).

*Id.*  The *Dow* court ultimately determined that, since the case was decided on a motion to dismiss, it was unable to tell solely from the complaint whether in pari delicto should bar the claim.

**{¶53}**  The trial court in the instant case relied on  *Murphy v. Kuhn*, 5th Dist. Stark No. 96 CA 0263, 1997 Ohio App. LEXIS 5900, citing *Evans v. Cameron*, 121 Wis.2d 421, 42, 360 N.W.2d 425 (1985) (client committed perjury in bankruptcy court, sued the attorney who advised him to commit perjury, but since perjury is a clearly illegal act, in pari delicto applied.)   The *Murphy* case involved a client who committed perjury in his divorce case. Murphy covertly obtained $60,000 from the equity line of credit on the couple's home and gave false testimony, under threat of contempt, regarding the proceeds.

**{¶54}** While the bailiff was taking Murphy to his jail cell as the result of the contempt finding, Murphy was overheard telling his son to look in a dresser drawer at

their home.  It was ultimately discovered that Murphy had apparently purchased another home with the proceeds.

{¶55}  Murphy was charged with perjury and subsequently filed a malpractice suit against his attorney, claiming the attorney advised him to commit perjury.  The appellate court affirmed the trial court's grant of summary judgment in the attorney's favor, finding the parties to be in pari delicto because the client knew that he should not perjure himself.

{¶56}  In reaching its decision, the *Murphy* court considered the holding of *Feld & Sons, Inc. v. Pechner, Dorfman, Wolfee, Rounick & Cabot*, 312 Pa.Super. 125, 142-143, 458 A.2d 545 (1983).  In *Feld*, the corporation, its officers and employees sued the attorneys who represented them in a labor dispute before the National Labor Relations Board.  They alleged that they were advised to commit perjury, falsify exhibits, and bribe a potential witness not to testify.  Some of the plaintiffs were convicted of federal crimes and fined for those activities.  The plaintiffs sought compensatory and punitive damages for professional malpractice, infliction of emotional distress, deceit, and breach of contract.

{¶57}  The trial court dismissed the complaint finding the parties to be in pari delicto.  The *Feld* court addressed levels of culpability as well as the public policy considerations of the doctrine:

> The doctrine is subject to qualifications, however, which have been variously stated.  In Story, *Equity Jurisprudence* § 423 (14th ed. 1918) it is said:  "And indeed in cases where both parties are in delicto, concurring in an illegal act, it does not always follow that they stand in pari delicto; for there may be, and often are, very different degrees in their guilt.  One party may act under circumstances of oppression, imposition, hardship, undue

influence, or great inequality of condition or age; so that his guilt may be far less in degree than that of his associate in the offense. And besides, *there may be on the part of the court itself a necessity of supporting the public interests or public policy* in many cases, however reprehensible the acts of the parties may be."

(Emphasis added). *Id*. at 131. *See also Baltimore & O. R. Co. v. Carman*, 71 Ohio App. 508, 513, 50 N.E.2d 358 (7th Dist.1942). ("If the parties appear not to have been in pari delicto, the one whose wrong is less than that of the other may be granted relief in some circumstances.")

**{¶58}** The *Feld* court proceeded to conduct an in depth analysis of the doctrine and how it had been applied in various jurisdictions. The court ultimately elected to forego a strict application of the doctrine but chose to apply the principle behind it, that while the court shall not lend its aid to an illegal act, it must also consider promoting the public interest. *Id.* at 136-138.

**{¶59}** The court's determination was guided by the opinion of Chief Justice Rugg in the case of *Berman v. Coakley*, 243 Mass. 348, 137 N.E. 667 (1923). In *Berman,* attorney Coakley and his friend, referred to as Corcoran, conspired to extort money from Berman, a Boston hotel owner. Coakley told Berman that Corcoran's wife was going to tell the district attorney that Berman allowed her to use the hotel for unlawful sexual activities. Berman hired Coakley to represent him in the matter. Coakley subsequently informed Berman that Corcoran and his wife agreed to withdraw the complaint if they were paid $35,000. Coakley advised Berman to pay them, and he did.

**{¶60}**    Berman sued Coakley whose defense was that Berman could not recover because the contract to pay the funds was illegal.   On appeal, the Massachusetts Supreme Judicial Court held that, even though the contract was illegal, the plaintiff should be allowed to move forward with his lawsuit:

> An attorney at law has been said to be a public officer.   He is an officer of the court sworn to aid in the administration of justice and to act with all good fidelity both to his clients and to the court.   The public have a deep and vital interest in his integrity.   [Citations omitted.]   It is a matter of profound importance from every point of view that members of the bar be men of probity and rectitude, zealous to maintain relations of utmost honesty with their clients and solicitous to protect them against legal wrong. Unflinching fidelity to their genuine interests is the duty of every attorney to his clients.   Public policy can hardly touch matters of more general concern than the maintenance of an untarnished standard of conduct by the attorney at law toward his client.   The attorney and client do not deal with each other at arms' length.   The client often is in many respects powerless to resist the influence of his attorney. If that influence be vicious, untoward, criminal, the relation of trust is abused and becomes a source of wrong. * * *
>
> The plaintiff and the defendants were not in pari delicto.   Whatever may be justly said in condemnation of the acts of the plaintiff is less than is necessary touching the acts of the defendant.

*Berman* at 354-355.

**{¶61}**   Guided by *Berman*, the *Feld* court stated:

> [Berman] stands for the proposition that even when the client has acted immorally or illegally, *the lawyer may not keep money gotten from the client in violation of the lawyer's professional obligations.* We find this proposition implicit in the Chief Justice's emphasis on "the maintenance of an untarnished standard of conduct by the attorney at law toward his client."

(Emphasis added.)   *Feld* at 139-141, quoting *Berman* at 354.

**{¶62}**   The *Feld* court concluded:

We therefore hold that when a lawyer has by immoral or illegal conduct violated his professional obligations to his client, an action by the client to recover the lawyer's fee will not be barred on the lawyer's plea that the client also engaged in immoral or illegal conduct.

*Id.* at 143.

**{¶63}** The Cuyahoga County Common Pleas Court has also recognized the necessity of protecting the public interest in applying the doctrine:

Even where the contract and parties are in pari delicto, the courts may interfere from methods of public policy. Whenever public policy is considered as advanced by allowing either party to sue for relief against the transaction, then relief is given him. In pursuance of this principle, and in compliance with the demand of a high public policy, equity may aid a party equally guilty with his opponent, not only by cancelling and ordering the surrender of an executory agreement, but even by setting aside an executed contract, conveyance, or transfer, and decreeing the recovery back of money paid or property delivered in performance of the agreement. The cases in which this limitation may apply, and the affirmative relief may thus be granted include the class of contracts which are intrinsically contrary to public policy, contracts in which the illegality itself consists in their opposition to public policy, and in other species of illegal contracts, in which, from their particular circumstances, incidental and collateral motives of public policy require relief.

*Kealey v. Faulkner*, 7 Ohio N.P. (n.s.) 49, 18 Ohio Dec. 498, 1907 Ohio Misc. LEXIS 76 (1907), quoting Pomeroy's Code, Sec. 941.

## B. Application to the Facts

**{¶64}** The joint stipulated facts of the parties provide that (1) Gombach received life insurance proceeds of more than $500,000; (2) Gombach retained Laurie to represent her in matters regarding her husband's estate including and in connection with creditors claims; (3) that certain funds were properly withdrawn as attorney fees and/or used to pay certain Gombach debts; and (4) that more than $300,000 of the funds was depleted by Laurie.

**{¶65}** Laurie's unauthorized depletion of client funds constitutes multiple violations of the Ohio Rules of Professional Conduct and the Code of Professional Responsibility. The misappropriation of client funds for an attorney's own use is not only unethical, it is illegal.

**{¶66}** In contrast to the position taken by Laurie and the trial court, and the cited cases that involve the commission of clearly criminal acts, the record does not reflect that Gombach engaged in an illegal, premeditated plot to defraud creditors and used Laurie or conspired with Laurie to do so. Gombach, her husband's estate, and his company were being pursued by creditors. Lawsuits, foreclosures and repossessions were in process. Gombach lost everything and moved in with her family. She consulted an attorney and followed his advice. There is no evidence in the record that there was any conspiracy or attempt to defraud third party creditors, except for the statements of defense counsel.

**{¶67}** Laurie filled out the answers to the Sky Bank affidavit. Laurie was unable to testify as to his thinking in preparing the responses. For example, perhaps his thinking

was that the listed accounts were, in fact, Gombach's accounts and the IOLTA account was not.   He may have determined that, as of the date of the affidavit, Gombach actually was not a beneficiary or owner of an insurance policy.

**{¶68}**   Laurie argues that Gombach knew the answers were incorrect and cites a portion of the transcript where Gombach says a response is inaccurate. Taken in full context, the transcript reflects that, after inquiring about each question, defense counsel asked whether the response cites the insurance proceeds, to which Gombach replied it did not.   Beginning with the inquiry by defense counsel regarding question 18:

> Q.   We move onto paragraph 18.   I have no account with any financial institution whatsoever except those listed. Again, you don't mention the IOLTA account, do you?
>
> A.   No, I do not.
>
> Q.   Page 6.   Question number 25, Mrs. Gombach.   I am not the beneficiary of any insurance policy except as listed in 22 above.   There's nothing listed on 22 above, is there?   It has N/A, meaning not applicable.
>
> A.   So it is not recorded.
>
> Q.   So it was inaccurate, correct?
>
> A.   Correct.

This exchange supports the proposition that the IOLTA account is not listed in the responses, not that it is an admission by Gombach that the responses are false.

**{¶69}**   Joint Stipulated Exhibit J does not support in pari delicto culpability of Gombach.   The exhibit is a handwritten letter dated September 14, 2006, to Laurie from Gombach containing a notation "regarding packet of ques. & ans."   Laurie listed Washington Mutual and Sky Bank as debtors in response to question 42.   Gombach's

letter inquires of Laurie, "I am questioning #42 on my pg. 9 regarding Washington Mutual and Sky Bank. They have cases against me but do I actually owe the thousands of dollars they say I'm indebted to pay them?"

{¶70} There is also a supplemental notation at the bottom of the exhibit indicating that Gombach talked with Laurie, "Vickie Handwriting says she wants original. Sky Bank needs original so he will call today Friday 15th." This evidence supports Gombach's testimony that she disputed signing the guaranty.

{¶71} Laurie also argues Gombach's response to defense counsel's inquiry as to whether she engaged in fraudulent activity demonstrates a premeditated illegal plot. Her response was, "[a]t the time, I didn't thoroughly look into it but, as I look back, maybe there's some truth to it." This statement does not rise to the level of a confession of a premeditated, illegal conspiracy to secret funds that served as her purpose for retaining Laurie. In addition, Gombach also testified on redirect that she did not know the elements of a fraudulent concealment.

{¶72} Gombach consulted Laurie by referral of counsel for the estate and company. She asked Laurie whether the funds could be protected and he told her that they could. Consulting an attorney regarding her rights as to the funds, seeking out the advice and expertise of an officer of the court, is not illegal. It is not illegal to hire an attorney to deal with creditor actions. Gombach testified that she "counted on the expertise that a lawyer would have in giving me advice of the safety of putting the money

there." Gombach's reliance on Laurie's legal expertise and advice is not illegal nor is it unreasonable under the circumstances.

{¶73} The doctrine of unclean hands is not available in this case because it requires that the defendant be damaged by the unclean hands of the plaintiff arising out of the transaction that serves as the foundation of the suit. Laurie was not damaged by the misappropriation of Gombach's funds, Gombach was. Further, the parties stipulated as follows, that Laurie wrongfully took the funds: "Beginning in 2010, Mr. Laurie began depleting Ms. Gombach's funds from the IOLTA account. Ms. Gombach did not herself receive all of these funds and did not otherwise benefit from the unauthorized withdrawals* * *." Stip. ¶7. Laurie was benefitted, not Gombach.

{¶74} The preceding analysis on the doctrine of in pari delicto also demonstrates that the doctrine is not applicable here. First, the doctrine is based on the premise that courts will not aid a man whose cause of action is based upon an illegal act. The evidence does not support the assertion that Gombach's retention of Laurie due to the conflict of interest between the company, estate, and Gombach; her inquiry of whether the insurance funds could be protected; and relying on Laurie's advice in moving forward, is an illegal act.

{¶75} In addition, the above cited cases regarding the enhanced culpability of an attorney as a matter of public policy supports our conclusion that the doctrine does not apply. Even assuming, arguendo, that in hindsight, Gombach questioned any of the

events that transpired, her reflection does not evidence illegal intent at that point in time nor does it rise to the level of equal culpability with her attorney, Laurie.

### C.    Legal Malpractice

**{¶76}**   To establish a claim for legal malpractice, a plaintiff must show, (1) the attorney owes the plaintiff a duty; (2) the attorney failed to conform to the standard of care required by law; and (3) a causal connection between the conduct complained of and the resulting damage or loss.  *Vahila v. Hall*, 77 Ohio St.3d 421, 674 N.E.2d 1164 (1997); *Solomon v. Harwood*, 8th Dist. Cuyahoga No. 96256, 2011-Ohio-5268, ¶ 25.

**{¶77}**   These elements have been met in this case.  We reject Laurie's assertion that Gombach's claim must fail because she did not provide expert testimony to support a malpractice claim.  While the law generally requires that expert testimony be submitted to establish a standard of care in a legal malpractice case, that is not necessary where the claim of unprofessional conduct is such that it comes within the ordinary knowledge of the jury.  *McInnis v. Hyatt Legal Clinics*, 10 Ohio St.3d 112, 113, 461 N.E.2d 1295 (1984).

**{¶78}**   The testimony of an expert is necessary where the question involves the lawyer's professional judgment in prosecuting or defending an action.  *Cross-Cireddu v. David J. Rossi Co., L.P.A.,* 8th Dist. Cuyahoga No. 77268, 2000 Ohio App. LEXIS 5480, at *9-10 (Nov. 22, 2000).  That is not the case here, particularly since the parties stipulated to the fact that Laurie depleted the funds without the knowledge or acquiescence of Gombach and the misappropriation of client funds is clearly illegal.

#### IV. Conclusion

**{¶79}** This court recognizes the basic premise of the in pari delicto doctrine that the court will not facilitate an illegal act. The illegal act we will not facilitate is the theft of client funds in this case. We, therefore, reverse and remand this case to the trial court to determine the amount of proceeds to be returned to Gombach due to the misappropriation of her funds.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

LARRY A. JONES, SR., P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR